836 So.2d 577 (2002)
STATE of Louisiana
v.
Carlos A. ZALDIVAS.
No. 02-KA-0690.
Court of Appeal of Louisiana, Fifth Circuit.
December 30, 2002.
*578 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison Wallis, Assistant District Attorneys, Gretna, LA, for Appellee.
Bertha M. Hillman, Thibodaux, LA, for Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, MARION F. EDWARDS and CLARENCE E. McMANUS.
MARION F. EDWARDS, Judge.
Defendant/Appellant, Carlos Zaldivas, appeals his conviction and sentence for *579 attempted second degree murder. For the following reasons, we affirm.
On February 15, 2000, the Jefferson Parish District Attorney filed a bill of information charging defendant, Carlos Zaldivas, with attempted first degree murder, a violation of LSA-R.S. 14:27:30. Zaldivas was arraigned on March 8, 2000, and pled not guilty. On August 18, 2000, the state amended the bill of information, reducing the charge to attempted second degree murder, a violation of LSA-R.S. 14:27:30.1.[1] Zaldivas filed a Motion to Suppress Confession, Identification, and Physical Evidence. The trial court heard and denied the motion to suppress the identification on February 22, 2001. It appears that Zaldivas abandoned the motion as it related to any confession or physical evidence.
Zaldivas was tried before a 12-member jury on February 21 and 22, 2002. At the conclusion of trial, the jury returned a verdict of guilty as charged. Zaldivas filed a Motion for New Trial on February 25, 2002. The trial court denied the motion on February 28, 2002. Zaldivas waived statutory delays, and was sentenced that day to 50 years at hard labor, without benefit of parole, probation or suspension of sentence. Zaldivas made an oral motion for appeal, and filed a written Motion for Appeal the same day, which the trial court granted.
Darryl Butler testified that, in June or July of 1999, he allowed defendant, Carlos Zaldivas, to move into his apartment at 3525 North Arnoult Boulevard in Metairie. Zaldivas had been living nearby with his parents, and he told Butler he was no longer welcome there. The two men agreed that Zaldivas would stay at the apartment for one month, during which time he would look for a permanent place to live. Zaldivas further agreed to pay Butler $50 each week for expenses. Butler testified that, for a time, he and Zaldivas shared an intimate relationship.
Butler stated that Zaldivas never complied with their agreement. Zaldivas stayed on for more than a month, and failed to contribute toward apartment expenses as promised. On Monday, November 15, 1999, Butler told Zaldivas he was no longer welcome to live there. Zaldivas became very upset, and told Butler that he would leave before he was put into jail for murder. When Butler returned home from work the following day, he found Zaldivas had moved his belongings out, and had left his apartment keys on a counter.
On November 19, 1999, Butler arrived home at about 10:00 p.m., after having visited his mother in the hospital. He watched television for several hours. During that time his telephone rang several times, but he did not answer the calls. By about 3:00 a.m. on November 20, Butler was sleeping on the couch. There was a knock at the front door, which Butler recognized as the knock Zaldivas used. Butler decided not to open the door. Five minutes later, the front window of the apartment was broken. Butler went to the window to investigate, and dialed 911 on his cordless telephone.
Zaldivas entered the apartment through the window. Butler could see that Zaldivas had removed the screen from the window and had broken the glass. Zaldivas berated Butler for not answering the door or telephone. Zaldivas took Butler's telephone. He then pulled an object from his pocket and used it to slash Butler's throat. Butler testified that the *580 weapon appeared to be a carpet knife with a razor blade in it.
Butler raised his arm to defend himself, and Zaldivas cut it with the weapon. Zaldivas continued trying to cut Butler. Eventually Butler managed to force Zaldivas out of the apartment. Butler then locked himself in his bathroom. He looked in a mirror and saw that he was bleeding profusely from his neck. He went outside to seek help.
Deputy Gerald Favalora of the Jefferson Parish Sheriff's Office testified that he and his partner, Deputy Weaver, responded to a 911 hang-up call at the North Arnoult apartment complex in the early morning hours of November 20, 1999. A Deputy Morris also reported to the scene. Morris held a towel to Butler's neck to help stanch the bleeding. Favalora noted that the victim had a laceration on his neck from below his left ear to his chin.
Emergency medical personnel were called, and Butler was transported to East Jefferson General Hospital, where he was treated by Dr. Raoul Guevera. Butler informed the doctor that his former roommate had broken into his apartment, threatened his life, and cut him with a razor knife. Dr. Guevera testified that the laceration to Butler's neck was close to the carotid artery, and that an injury to that artery would have caused Butler to bleed to death within minutes.
Favalora took a brief statement from Butler before he was taken to the hospital. The victim reported that his former roommate had broken the window to his apartment, produced a knife, and slashed his neck. Butler named Carlos Zaldivas as the perpetrator of attack.
On November 29, 1999, Detective Craig Gardner met with Butler and showed him a photographic lineup. The victim positively identified Zaldivas as his attacker. Butler told Gardner that Zaldivas had broken into his apartment and sliced him with a razor blade. Detective Gardner testified that officers tried unsuccessfully to locate Zaldivas at his parents' address. Zaldivas was ultimately arrested on January 1, 2000.
Angela and Christopher Mayer, Zaldivas' teenage niece and nephew, testified on his behalf. They stated that on the night of November 19-20, 1999, Zaldivas slept at their house in Marrero.
At trial, Zaldivas vehemently denied ever having intimate relations with Butler, and testified that he moved out of the apartment because he disapproved of Butler's lifestyle. Zaldivas testified that he did not threaten or attack Butler. He further posited that Butler was attacked by men to whom he owed money.

LAW AND ANALYSIS
In his first assignment of error, Zaldivas argues the state failed to prove he committed attempted second degree murder, as his alibi witnesses successfully discredited the testimony of the state's only eyewitness, Darryl Butler. The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[2] requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[3]
To prove attempted second degree murder, the state must establish, beyond *581 a reasonable doubt, that the defendant specifically intended to kill a human being[4] and that he committed an overt act in furtherance of that goal.[5] Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."[6] Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and actions of the defendant.[7]
The state's only eyewitness was the victim, Darryl Butler. Jurisprudence provides that in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding.[8] Butler positively identified Zaldivas as his attacker on several occasions. He gave Zaldivas' name to officers who responded to his attempted 911 call and to the doctor who treated him in the hospital emergency room.[9] He identified Zaldivas in a photographic lineup and at trial. It is undisputed that Zaldivas and Butler knew each other for some time before the stabbing, so there seems to be no question of Butler's ability to recognize Zaldivas.
Butler asserted at trial that Zaldivas' attack was triggered by his decision to have Zaldivas move out of his apartment. This testimony presented the jury with a possible motive. Zaldivas' verbal threats, the force of his attack, and the severity of Butler's injuries can be viewed as indicative of specific intent to kill. It is clear from Zaldivas' own trial testimony that he bore Butler a great deal of ill will.
Dr. Raoul Guevera, who treated Butler's wounds, testified that Butler had a large laceration on the left side of his neck. The layer of muscle that was cut overlies the carotid artery, the vessel that carries blood from the heart to the brain. A laceration of the carotid artery would have caused profuse bleeding, leading to death within a few minutes. According to Guevera, it would have taken significant force to cause such an extensive laceration, as it went deep into the muscle. The doctor further noted a laceration to the scalp, a laceration of the back of the arm consistent with a defensive wound, and a smaller forearm laceration. He stated that the wounds had clean edges, and were thus consistent with a weapon such as a box cutter or some other type of straight-edged blade.
Zaldivas argues that he was able to refute Butler's testimony at trial. Angela Mayer testified that Zaldivas, who is her uncle, moved into her mother's home on Lee Drive in Marrero in August or September of 1999. On November 20, Zaldivas slept at the house. Also staying there were Angela's two brothers, her mother and her cousin, Carlos (Zaldivas' son). Angela was certain Zaldivas was with her family that weekend, as it was the weekend before Thanksgiving. Angela testified that Zaldivas was at home when she went to sleep on the night of November 19, 1999, and that he was at work when she *582 awoke at noon on November 20. Angela stated there was no way Zaldivas could have left the house during the night, as her mother locked all of the burglar bars and gates for security purposes.
Christopher Mayer, Angela's brother, testified that he was living at the Marrero house in September of 1999, when Zaldivas moved in with his family. Zaldivas lived with them through December 1999. Christopher stated that Zaldivas was at the Marrero house on the weekend of November 20, 1999. Christopher went to bed at about 10:00 or 11:00 p.m. on November 19. He did not see Zaldivas go to bed that night, but guessed that it was at about 11:00 p.m. Christopher awoke at 8:00 on the morning of November 20. He testified that Zaldivas was still asleep at that time, and he woke him for work. Zaldivas normally goes to work at 6:30 on Saturday mornings, but on that morning he overslept. Although Christopher was asleep in a separate room, he said he knew Zaldivas was at home at 3:00 a.m. on November 20, 1999.
Julio Hernandez, a general contractor, testified that Zaldivas was in his employ in November 1999. Zaldivas did not own a car, so Hernandez routinely picked him up at the house on Lee Drive, and drove him to work. Hernandez testified that he and his crew worked many Saturdays. However, he had no documentation to show that Zaldivas worked on the morning of November 20, 1999, or that he was paid for working that day.
None of Zaldivas' witnesses was with him at 3:00 a.m. on November 20, 1999, and thus none of them could testify to a certainty that Zaldivas was at the Lee Drive house at the time the attack on Butler took place. Moreover, their testimony conflicts with Zaldivas' own testimony that he lived with Darryl Butler during November of 1999.
The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.[10] Where there is conflicting testimony about factual matters, the resolution of which depends on a determination of credibility of witnesses, it goes to the weight of the evidence, and is not part of a sufficiency determination.[11] We need only make a determination as to sufficiency, not witness credibility. Based upon our review of the record, we find that the state provided sufficient evidence under the Jackson standard to support a conviction for attempted second degree murder. This assignment of error merits little consideration.
In his second assignment of error, Zaldivas complains that his 50-year sentence, the maximum allowed for attempted second degree murder is excessive, arguing that the trial court failed to consider various mitigating circumstances under LSA-C.Cr.P. art. 894.1. We first note that Zaldivas failed to file a timely written motion to reconsider sentence, as prescribed by LSA-C.Cr.P. art. 881.1. The record does show, however, that Zaldivas made the following oral objection at the time of sentencing: "We do object to the sentencing as being unduly harsh." Article 881.1 provides that a motion to reconsider sentence, whether oral or written, must set forth specific grounds on which the motion is based. It does not appear that Zaldivas' oral motion contained the specificity required to preserve the issue for review.[12] In previous cases, we have *583 held that the failure to move for reconsideration of sentence, or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness.[13]
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.[14] Even a sentence which falls within the statutory limits may be excessive under certain circumstances.[15]
A reviewing court will not set aside a sentence as excessive if the record supports the sentence imposed.[16] Factors the court may consider in reviewing the sentencing judge's discretion are: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.[17]
In his reasons for sentencing, the trial judge commented:
Mr. Zaldivas on the stand said he didn't feel sorry for this victim that this horrible crime had happened to, so it goes beyond him saying he committed the crime and I'm sorry. Certainly he denied that he committed the crime. The jury found that he did in fact commit the crime.
The Court, after reviewing the record, and the Court takes into consideration the sentencing guidelines provided in the Code of Criminal Procedure Article 894.1. The Court finds that Mr. Zaldivas certainly is in need of correctional treatment based upon this horrible crime that was in fact committed.
. . . .
During the commission of the crime the defendant, knowing he created a risk of death and great bodily harm to the victim in this matter, the crime was committed by using a dangerous weapon. The victim of this crime was horribly wounded. It is only but for chance, or by the grace of God that Mr. Zaldivas was charged with attempted second degree murder and not second degree murder.
We heard the testimony of the doctor, who told this jury how close the victim was to being killed rather than being an attempted murder.
. . . .
The scars that remain for the rest of the victim's life are horrible. Mr. Zaldivas is fortunate that by that chance this victim survived the horrible act.
It does not appear that the trial court abused its discretion in imposing the maximum sentence. Defendant's date of birth is listed on the bill of information as July 6, 1961, making him 38 years of age at the time of the offense. This was not the act of an impetuous youth. Zaldivas conceded at trial that he had a prior cocaine conviction. *584 However, considering that the conviction was about 20 years prior to the instant offense, it has little bearing on this case. The trial court's primary concerns were the brutality of the attack, and Zaldivas' obvious lack of remorse.
In his testimony at trial, Zaldivas showed a great deal of contempt for the victim. Zaldivas expressed his feelings in his responses to the prosecutor's cross-examination:
Q. Did you care whether or not this happened to Mr. Butler or did you think he deserved this, because of his lifestyle, according to you?
A. No, sir.
Q. He did not deserve this?
A. I didn't care about Mr. Darryl.
Q. You didn't care about Mr. Darryl?
A. No, sir.
Based on the foregoing, we find that Zaldivas' sentence is not constitutionally excessive.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[18] and State v. Weiland.[19] No patent errors were found.
Accordingly, based on the foregoing, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] It is unclear from the record whether defendant was arraigned as to the amended charge. The minute entry is silent on that point, and that day's proceedings were not transcribed.
[2] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[3] State v. Juluke, 98-0341 (La.1/8/9), 725 So.2d 1291; State v. Williams, 99-223 (La. App. 5 Cir. 6/30/99), 742 So.2d 604.
[4] While specific intent to inflict great bodily harm is sufficient to support a murder conviction, first or second degree attempted murder requires a specific intent to kill. State v. Cepriano, 00-213, p. 6 (La.App. 5 Cir. 8/29/00), 767 So.2d 893, 897, 898.
[5] State v. Harrell, 01-841, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
[6] LSA-R.S. 14:10(1).
[7] State v. Harrell, supra, at 1015, 1019.
[8] State v. Rivers, 01-1251, p. 6 (La.App. 5 Cir. 4/10/02), 817 So.2d 216, 219.
[9] The doctor testified that Butler was able to relate the details of the attack coherently, and did not appear to be mentally impaired.
[10] State v. Simard, 01-1373, p. 6 (La.App. 5 Cir. 4/30/02), 817 So.2d 366, 370.
[11] State v. Simard, 01-1373 at p. 7, 817 So.2d at 370.
[12] See, State v. Freeman, 97-1115, p. 8 (La. App. 5 Cir. 12/29/98), 727 So.2d 630, 635, in which this Court found that "[a] statement challenging a sentence as excessive does not set forth specific grounds...."
[13] State v. Brown, 01-160, p. 14 (La.App. 5 Cir. 5/30/01), 788 So.2d 667, 674.
[14] State v. Wickem, 99-1261, p. 10 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
[15] State v. Short, 00-866, p. 12 (La.App. 5 Cir. 10/18/00), 769 So.2d 823, 831, writ denied, 00-3271 (La.8/24/01), 795 So.2d 336.
[16] LSA-C.Cr.P. art. 881.4D; State v. McCorkle, 97-966, p. 14 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212, 1219.
[17] State v. Ulmer, 99-1079, p. 4 (La.App. 5 Cir. 1/25/00), 751 So.2d 1017, 1019.
[18] 312 So.2d 337 (La.1975).
[19] 556 So.2d 175 (La.App. 5 Cir.1990).