866 So.2d 931 (2004)
STATE of Louisiana
v.
Anthony D. JEFFERSON.
No. 03-KA-820.
Court of Appeal of Louisiana, Fifth Circuit.
January 27, 2004.
*933 Paul D. Connick, Jr., District Attorney, Andrea F. Long, Terry M. Boudreaux, Kia Habisreitinger, Christopher Cox, Assistant District Attorneys, Gretna, LA, for Appellee.
Prentice L. White, Baton Rouge, LA, for Appellant.
*934 Anthony Jeffersonin Proper Person, Angola, LA.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant, Anthony Jefferson, appeals his conviction and sentence for theft in the amount of more than five hundred dollars. For the following reasons, defendant's conviction and sentence are affirmed, and we further order the commitment amended to conform with the transcript in this case, in order to correct an error patent on the face of the record.
On July 9, 2002, the Jefferson Parish District Attorney filed a bill of information charging defendant, Anthony Jefferson, with theft in the amount of more than five hundred dollars, a violation of LSA-R.S. 14:67. Jefferson's mother, Maxine Mahaffy, was also charged as a co-defendant. Jefferson was arraigned on July 10, 2002, and pled not guilty.
Co-defendant Maxine Mahaffy filed pretrial motions to suppress the evidence, confession and identification, and it appears from the record that Jefferson adopted Ms. Mahaffy's motions. On November 14, 2002, the trial court held a hearing on the motions to suppress the evidence and the identification. The court denied the motion to suppress evidence, and deferred its ruling on the motion to suppress identification.[1]
Jefferson was tried together with his co-defendant by a six-person jury on November 20 and 21, 2002. The jury returned a verdict of guilty as charged. Ms. Mahaffy filed a Motion for New Trial on December 11, 2002, which Jefferson adopted.
On December 12, 2002, the trial court heard arguments on the new trial motion, and denied it. Defense counsel waived statutory delays, and the court sentenced Jefferson that day to serve eight years at hard labor. The state thereafter filed a habitual offender bill, alleging Jefferson to be a fourth felony offender.
Jefferson filed a Motion for Appeal in proper person on December 2, 2002. Defense counsel filed a Motion for Appeal on December 12, 2002, and the trial court granted Jefferson an appeal on December 12, 2002.[2] A habitual offender hearing was held on January 9, 2003, and the court found Jefferson to be a fourth felony offender. On that day, the judge vacated Jefferson's original sentence and imposed an enhanced sentence of thirty-five years, without benefit of probation or suspension of sentence.
At trial, Carmen Vitrano testified that she generally works at night, and that after work she sometimes goes to a donut shop called "Coffee & ..." at 2010 Williams Boulevard in Kenner. At about 3:00 a.m. on May 8, 2002, she went into the shop, ordered a cup of coffee, and asked the cashier, Maxine Mahaffy, for change to use in the video poker machines. She gave Ms. Mahaffy two hundred dollars in cash, and then went into the restroom. A donut cutter named Jonas Hall[3] was the *935 only employee in the shop aside from Ms. Mahaffy.
When Ms. Vitrano returned to the serving area, she saw that a male customer known to her as George was now sitting at the counter, asleep. Jonas Hall's shift had ended, and he had left the shop. A man was standing at the counter talking to Ms. Mahaffy. The man told Ms. Mahaffy that he wanted the money bag, saying "If you do as I tell you, nobody will get hurt. I have a gun." Ms. Vitrano testified that Ms. Mahaffy motioned to her by nodding her head, as if she were attempting to let the man know Ms. Vitrano was there. The man turned to look at Ms. Vitrano, and she was able to see his face. Ms. Vitrano testified that she saw the man, later identified as Anthony Jefferson, holding what she believed was a gun, but that it was partially hidden by his hand.
Ms. Mahaffy walked toward the back of the shop, and returned minutes later with a zippered bag. Ms. Mahaffy opened the bag, removed currency, and placed it in one of the shop's white paper bags. She gave the bag to the perpetrator and he left the shop. Ms. Vitrano testified that the man did not ask for the money that was in the cash register. Ms. Vitrano further remarked that Ms. Mahaffy did not appear distressed either during or after the robberies.
Ms. Mahaffy told Ms. Vitrano she had been robbed. Ms. Vitrano asked Ms. Mahaffy whether she was going to call police. Mahaffy responded, "Well, yeah." Ms. Mahaffy then went to the telephone and began to shake it. She told Ms. Vitrano it was not working. Minutes later, when the phone became operable, Ms. Mahaffy telephoned Randal Daigle, the manager of the shop. Mr. Daigle testified that when he spoke to Ms. Mahaffy on the telephone, he asked whether she had called police. When she said she had not, he told her to do so.
Ms. Vitrano again prompted Ms. Mahaffy to call police. Instead, Ms. Mahaffy waited on a customer. Her attitude remained nonchalant, and she did not appear shaken or frightened by the incident. Ms. Vitrano again insisted that Ms. Mahaffy telephone police. It was only then that the cashier called 9-1-1. A cassette tape of Ms. Mahaffy's call to 9-1-1 was admitted in evidence and was played for the jury.
Mr. Daigle testified that he routinely keeps two thousand dollars in a bag inside the shop's safe in order to pay winnings on the shop's video poker machines. The safe also contains another one thousand dollars in cash. The cashier on duty has access to the safe. Daigle went to the shop after Ms. Mahaffy called him to report the robbery. He found that the one thousand dollars was still in the box inside the safe, and that there was no money missing from the cash register. Daigle testified that the shop is equipped with security cameras, but that they were out of service at the time of the offense.
Officer Pat Gallagher of the Kenner Police Department testified that he reported to Coffee & ... after hearing an alert over the police radio regarding a robbery there. Gallagher was accompanied by an officer trainee, Louis Frost. Gallagher and Frost supervised the scene. Gallagher testified that he observed Ms. Mahaffy as she waited on customers. She seemed a bit nervous, but did not appear upset over the incident.
Ms. Mahaffy told Officer Gallagher that the perpetrator was a short black man wearing a black T-shirt and dark-colored pants. She said the perpetrator implied he had a gun, but that she did not see it. She told the officer that the man asked for the money bag, and that she retrieved it *936 from the back room. Gallagher asked her how someone would know there was a money bag in the back room. Ms. Mahaffy responded that she had taken the bag out earlier to pay out some video poker winnings. Gallagher inquired as to whether the perpetrator was at the shop when she took out the bag, and she said he was not.
Ms. Vitrano testified that the perpetrator was a black man who stood 5' 8" to 5' 9" tall. He wore a white T-shirt with writing on it, blue jeans, and a dark-colored cap. Ms. Vitrano testified that when police officers arrived at the scene, she attempted to give them information, but they did not seem interested in what she had to say. She heard Ms. Mahaffy give inaccurate and conflicting accounts of the incident.
On May 20, 2002, Detective Cunningham interviewed Ms. Vitrano at her home. He presented her with a photographic lineup from which she identified defendant, Anthony Jefferson, as the perpetrator. She signed the back of Jefferson's photograph, adding the date and time when she made the identification. Cunningham also showed the photographic lineup to Ms. Mahaffy, who told him she could not identify any of the subjects as the man who took the money. She did not immediately point out to the officer that her son's photograph was included in the lineup. However, when Cunningham told her that Jefferson had been identified as the robber, Ms. Mahaffy said, "Oh, that's Anthony's picture there."
Detective Cunningham asked Ms. Mahaffy whether she had had anything to do with the incident. She denied any involvement. She also told him that her son had been out of town for two months. Cunningham responded that he had information that defendant had been in the city for four days prior to the interview. Ms. Mahaffy then remembered that her niece had seen defendant on the preceding Sunday.
Based on the information he collected, Detective Cunningham obtained a search warrant for Ms. Mahaffy's residence at 2200 Idaho, Apartment A, in Kenner. He participated in the search of the apartment. Among the items recovered were a dark-colored baseball cap, a payroll check bearing defendant's name, and a photocopy of Jefferson's Louisiana driver's license. The address on the license was 2200 Idaho, Apartment A. Cunningham testified that the apartment is two city blocks away from the donut shop.
In her trial testimony, Ms. Mahaffy denied that either she or her son were involved in the crime. She testified that, at the time of the incident, Ms. Vitrano was playing video poker, and could not have seen the perpetrator's face from her vantage point. Ms. Mahaffy further testified that the hat seized at her apartment belongs to her daughter's husband.
Mattie Evans, Ms. Mahaffy's sister, testified that she is a cook at the donut shop. She went on duty shortly after the offense occurred. With respect to Ms. Mahaffy's delay in calling police, Ms. Evans testified that the telephone in the shop had not been working properly for two to three weeks leading up to the robbery. Ms. Evans further testified that she knows Ms. Vitrano as a regular customer at the shop. When police arrived at the shop to investigate the robbery, Ms. Evans heard her tell them that she had not seen the robber's face.
We first address Jefferson's assignment of error related to his Motion for a New Trial on the basis of what he considers to be a highly suspect witness identification. Specifically, Jefferson argues that the witness' identification of him was suspect since she willingly conceded that she only *937 got a "glimpse" of the perpetrator and could not properly identify the clothing found in the residence to be the same item worn by the assailant on the night in question.
The record shows that Jefferson joined in a Motion for New Trial filed by co-defendant Maxine Mahaffy on December 11, 2002. LSA-C.Cr.P. art. 842 provides that "[i]f an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants." This applies, by analogy, to written motions.[4]
A review of the new trial motion shows that the sufficiency of identification evidence was not raised as an issue therein. LSA-C.Cr.P. art. 852 provides that a motion for new trial "shall be in writing" and "shall state the grounds upon which it is based." Such an omission does not preclude appellate review of a defendant's allegation that the state failed to present sufficient evidence to prove an essential element of the charged offense.[5] We find that Jefferson is, nevertheless, not entitled to review of this issue, as his brief contains no argument regarding the sufficiency of Ms. Vitrano's identification. Similarly, Jefferson offers no argument with respect to the reliability of the identification procedure (i.e., the photographic lineup).
Co-defendant Maxine Mahaffy did file a motion to suppress the identification. The motion came on for hearing on November 14, 2002. The trial judge deferred his ruling on the motion until such time as the state could produce the photographic lineup for his examination. The record shows that prior to the commencement of trial on November 20, 2002, the prosecutor asked the judge for a ruling on the motion to suppress identification. The discussion turned to other pre-trial matters, and the judge failed to rule on the motion. Jefferson did not object to the court's failure to issue a ruling. It is well settled that a defendant who proceeds to trial without objecting to the trial court's failure to rule on an outstanding motion waives the pending motion.[6] Furthermore, assignments of error that are neither briefed nor argued are considered abandoned on appeal.[7]
As part of his argument in support of this assigned error, Jefferson also argues that the trial court erred in denying his motion to suppress the evidence. Jefferson asserts that he argued in his motion to suppress that the search warrant for the Idaho Avenue apartment was stale by the time it was executed, and that it was not based on probable cause. This argument is not encompassed by Jefferson's stated assignment of error, however, as it has nothing to do with the new trial motion.
Additionally, Jefferson refers in his brief to a motion to suppress which he filed. Again, the only motion to suppress evidence found in the record is a motion filed by co-defendant, Maxine Mahaffy. That motion is nonspecific, and contains no allegation regarding the timeliness of the search warrant's execution, or the probable cause to support said warrant. Moreover, a reading of the hearing on the motion *938 to suppress evidence does not show that defense counsel made any argument or presented evidence with respect to timeliness of the warrant's execution. There is, therefore, nothing for this Court to review with respect to that issue, and accordingly, we find this assignment of error to be without merit.
Jefferson next argues that the district court erred in denying his Motion for a New Trial since it was undisputed that the process server failed to timely issue a subpoena for a witness that could have provided vital information in favor of the defense. In several pro se assignments of error, Jefferson asserts that the trial court denied him the right to compulsory process. Specifically, Jefferson complains that he was denied his right to compulsory process due to the absence of a potential defense witness, Jonas Hall. Jefferson further argues that the trial court erred in denying the motion for new trial, the vehicle by which he raised this issue below.
Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to compulsory process and to present a defense.[8] The state violates that right when it arbitrarily denies a defendant the opportunity to put on the stand a witness whose testimony would be relevant and material to his defense.[9] A defendant's right to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served.[10]
The potential defense witness, Jonas Hall, was an employee of the donut shop. The record shows that defendant received notice on September 16, 2002 that his trial was scheduled for the week of November 18, 2002. However, it was not until November 20, 2002, the day trial began, that Maxine Mahaffy's attorney filed a request with the clerk of court to issue instanter subpoenas for three witnesses, including an individual listed only as "Jonas." There were two addresses listed for Jonas: one on North Howard Street in Metairie and the other at 2010 Williams Boulevard in Kenner, the location of Coffee & .... That subpoena was returned unserved, with the notation, "Need full name of witness."
Immediately prior to jury selection, Ms. Mahaffy's counsel, Mr. Netterville, addressed the court with regard to the instanter subpoenas:
One of the people we had subpoenaed actually works for the coffee shop. We don't know his last name. His name is Jonahs. He comes in at three in the morning and he works until either ten or two depending on how he's needed. So we don't hold this up later on looking for this witness, he's actually under the control of the State's primary witness, the victim in this case, so we have issued the subpoena for him.
But if we're going to move things along a little easier, I just ask the State to ask their victim, alleged victim to have the man here by the time we start our case, and we subpoenaed him at his home and the coffee shop.
Mr. Netterville then informed the judge that he did not know the witness' last name; only that his first name was Jonas and that he was a donut cook at the shop. The judge told counsel, "in all fairness to *939 the sheriffs, I can't demand that the sheriffs serve a subpoena on just a Jonahs." The prosecutor informed the court that the witness' last name was Hall, and that Randy Daigle, the manager of the donut shop, would telephone him and ask him to go to court.
Mr. Netterville later informed the court that Mr. Daigle had contacted Mr. Hall, but that Hall was not able to get to court at that time. Additionally, Hall had not received a subpoena. Mr. Netterville suggested that a process server deliver a subpoena to the donut shop at 9:30 that night, when Hall was scheduled to go on duty.
The judge asked Mr. Netterville, "What are you requesting that I do?" Counsel responded, "Enforce the compulsory process provisions of the Constitution." Mr. Netterville said he did not have Mr. Hall's telephone number, but that it appeared Mr. Daigle would be in touch with him. It was at that point that jury selection began. When the state rested its case, Mr. Netterville proceeded with his case without mention of Mr. Hall.
Mr. Netterville called three witnesses, including Ms. Mahaffy. Thereafter, the following exchange ensued:
MR. NETTERVILLE:
We have no other witnesses except we would ask that [sic] Court to subpoena Jonahs Hall. We would ask the Court to subpoena Jonahs Hall and Mr. Hall is not here. I talked to Mr. Hall by telephone. He works for
THE COURT:
Mr. Netterville
MR. NETTERVILLE:
He's not present.
THE COURT:
none of that. Come on.
MR. NETTERVILLE:
I don't have him here. We object to him not being here.
We rest.
Defendant's counsel, Ms. Guste, rested without objecting to Mr. Hall's absence, and without having called a single witness.
On December 12, 2002, Mr. Netterville argued in support of the Motion for New Trial. Ms. Guste, declined to present an argument. Mr. Netterville asserted that Mr. Hall would have refuted Ms. Vitrano's identification testimony, and that Hall's testimony "would have been very, very important." In an affidavit dated December 10, 2002 and attached to the new trial motion, Jonas Hall stated that he returned to the donut shop after the robbery and saw Ms. Vitrano playing video poker. He heard Ms. Vitrano say she did not see the robber's face. The prosecutor argued that Mr. Netterville should have attempted to locate Mr. Hall long before the day of trial, and that his choice to wait until then was a matter of trial strategy.
The trial judge denied the motion. In response to counsel's argument, the judge noted that the trial lasted for two days. On the first day, court did not recess until 11:00 p.m. Mr. Netterville had ample opportunity to secure Mr. Hall's presence on that day. Moreover, Mr. Netterville could have had the witness appear on the second day of trial. The judge did not feel that counsel made sufficient effort to secure Mr. Hall's presence.
After a review of the record, we find that the trial court did not err in its ruling. The defense was remiss in failing to request a subpoena for Mr. Hall in advance of trial. The defense also failed to make the minimal effort it would have taken to obtain the witness' last name. Instead, defense counsel apparently assumed the prosecutor would have one of the state's witnesses secure Mr. Hall's presence. The government generally has *940 no obligation to look for a defendant's witnesses unless a witness has been made unavailable through suggestion, procurement, or negligence of the government.[11]
Mr. Netterville and Jefferson's counsel might have sought relief below by moving for a continuance prior to trial[12] or by requesting a recess in the proceedings in order to search for Mr. Hall. They did neither. In State v. Luna,[13] this Court rejected the defendant's argument that he was deprived of his right to compulsory process when the trial court proceeded to trial absent some defense witnesses. This Court found the defendant was not denied the right to present a defense or the right to compulsory process "because of his apparent knowledge of the trial date, his failure to file a continuance, and his failure to move for a recess."[14]
Neither Mr. Netterville nor defendant's counsel moved the court to allow a proffer of the evidence they wished to elicit from Mr. Hall. In State v. Gordon,[15] this Court rejected the defendant's argument that he was deprived of his right to compulsory process when several defense witnesses were not subpoenaed for trial despite his submission of several pre-trial motions. This Court reasoned that there was nothing to show that the defendant raised the issue before the district court at the time of trial, and that there was nothing in the record to show that the defendant made a proffer of what the witnesses' testimony would be if they were to testify.
We further find that Jefferson was not prejudiced by his inability to call Mr. Hall as a witness. His testimony would have been duplicative of Ms. Evans' and Ms. Mahaffy's testimony that Ms. Vitrano said she had not seen the perpetrator's face. Based on the foregoing, we find these assignments of error to be without merit.
In his next assignment of error, Jefferson asserts that "the district court's answer to the jury's inquiry during the deliberation period was prejudicial because the answer submitted to the jury did not specifically address the questions asked by the jury and district court did seek any guidance from the parties on how to answer said question? [sic]" Jefferson also argues that the trial court erred in giving erroneous jury instructions on "reasonable doubt" over defense counsel's objections. Jefferson claims that the trial court's instruction to the jury regarding reasonable doubt was incorrect, and that it served to lessen the burden of proof by which the jury evaluated the state's case.
In his initial jury charge, the judge stated, in part:
Ladies and gentlemen, a person who is accused of a crime is presumed by our law to be innocent until each element of the offense necessary to constitute their guilt is proven beyond a reasonable doubt.
It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the Court, *941 to give the defendant or defendants the benefit of any reasonable doubt arising out of the evidence or out of the lack of evidence in this case.
It is also the duty of the jury, if not convinced of the guilt of the defendant beyond a reasonable doubt, to find them Not Guilty.
A reasonable doubt is a doubt based upon reason and common sense.
This instruction tracks the mandatory language in LSA-C.Cr.P. art. 804(A).
After deliberations were begun, the jury requested that the judge give further instruction with regard to reasonable doubt. The judge stated:
All right. As I instructed you earlier, I said that what we mean by "reasonable doubt" is a doubt which is based upon reason and common sense. To elaborate on that definition, the law goes on to state, "While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. A reasonable doubt is a doubt based upon reason and common sense and is present when, after you have carefully considered all the evidence, you can not say that you are firmly convinced of the truth of the charge."
Ms. Mahaffy's attorney objected and moved for a mistrial, on grounds that the court's supplemental explanation of reasonable doubt was incomplete, and denigrated the burden of proof. The court denied the mistrial. Defendant restates counsel's argument here, although he does not say precisely what part of the charge he feels is improper.
The instruction in this case tracks the proposed charge on reasonable doubt in Louisiana Judges' Criminal Bench Book, Vol. I, § 3.03, which reads:
While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt which is based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge.
Additionally, the trial court's supplemental charge is included in the charge approved by the Louisiana Supreme Court in State v. Brumfield.[16]
Based on the foregoing, we find that the trial court's charge on reasonable doubt was not unconstitutional. This assignment is without merit.
Jefferson next argues that his thirty-five year sentence as a fourth felony offender is unconstitutionally excessive in that it is not tailored to his offense, and amounts to a needless imposition of pain and suffering.
We note that Jefferson did not make an oral or written motion to reconsider sentence in the district court.[17] The failure to file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a review of the sentence for constitutional excessiveness.[18]
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A *942 sentence is constitutionally excessive, even if it is within statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering.[19] Trial judges are granted great discretion in imposing sentence, and if the record supports the sentence imposed, the court of appeal will not set it aside on grounds of excessiveness.[20]
The sentencing range to which Jefferson was subject under the law at the time of the underlying offense was twenty years to life.[21] At the time of the habitual offender sentencing, the prosecutor listed for the court Jefferson's defendant's prior offenses.[22] There were two felony thefts in 1999, one of which was used as a predicate offense in the habitual offender bill. Jefferson's record also includes a simple escape, purse snatching, issuing worthless checks, and an earlier conviction for felony theft. The prosecutor further noted that he had recently handled charges against Jefferson in another section of court involving possession of a gun. The prosecutor characterized Jefferson as a career criminal whose conviction record dates back to 1983. He requested that the court impose a sentence of at least forty years.
The trial judge allowed both defense counsel and defendant to respond to the prosecutor's remarks. Counsel asked the court to consider Jefferson's age, of nearly forty. She also argued that Jefferson's prior offenses did not involve weapons. The judge imposed sentence without giving reasons. After reviewing the record, we find the trial court did not abuse its wide discretion in imposing a forty-year sentence. First, the sentence is near the lower end of the statutory range. Secondly, the sentence is supported by the record.
Based on the foregoing, we find this assignment to be without merit.
In his next two pro se assignments, Jefferson first asserts that the trial judge erred when he went into the jury-deliberating room during deliberations and discussed his opinion of appellant's and co-defendant's guilt and reasons for guilt with degrees of culpability, outside the presence of appellant and counsel. Jefferson then argues that his trial counsel was ineffective "wherein after learning of the trial judge's errors in Assignment of Error Number One, counsel failed to move for a continuance in sentencing and timely move for a new trial based upon the judge's errors."
The record shows that, after the jury returned its verdict, the trial judge thanked them for their service, and directed them to go to the jury room. He then said, "I'll met [sic] with you in just a moment if you don't mind." There is nothing in the record to show that Jefferson or his attorney had, at that point, left the courtroom. The judge went on to discuss the date of sentencing with Ms. Mahaffy's attorney. There was no objection to the judge's statement that he planned to speak to the jurors.
*943 At the time of sentencing, the judge made the following comments in reference to his post-verdict discussion with the jurors:
When the jury came in the courtroom I noticed what I guess I can explain is maybe somewhat looks of exasperation on the faces of the jurors and I felt it was sometimes necessary after two long days and it had been two long days for the jury to go into the room to talk to them about the case and basically they asked me what did I think and what was I going to do and they specifically said with Ms. Mahaffy. I said, "I think Ms. Mahaffy made a mistake because of her love for her son." I said, "I do believe unfortunately Ms. Mahaffy was involved and did attempt to help her son." But they expressed a concern to me that they wanted me to show some leniency, some compassion, some mercy with regard to Ms. Mahaffy because they said that she is not a bad person in their mind or their opinion and they felt that she was working for, unfortunately, the rotten apple in the group and that a mother has a love for her son and that a mother's love for that son is going to sometimes get even the mother in trouble. But it was their desire that she be made to make restitution to the victim as a result of her participation in this activity. It was also their expressed desire that she not be made to serve any jail time because they felt up to this point in her life she had lived an exemplary life and they felt that there should be some reward given to her as a result of that. So, essentially the jury asked me for some leniency or some consideration in sentencing with regard to Ms. Mahaffy.
Neither Jefferson's counsel nor Ms. Mahaffy's counsel made objections in response to the judge's disclosure. Both defendants waived statutory delays, and stated they were ready for sentencing. In failing to make a timely objection below, Jefferson failed to preserve this issue for appeal.[23] Furthermore, Jefferson would not be entitled to review of this issue even if his counsel had objected, since Jefferson's complaint has to do with a sentencing hearing whose results were later vacated when he was sentenced as a habitual offender. Because there is nothing for this Court to review, this assignment is without merit.
Finally, Jefferson asserts that the trial court erred in sentencing him as a multiple offender under the double jeopardy clause. Because Jefferson has not briefed the assignment, however, it is considered abandoned, pursuant to Uniform Rules Courts of Appeal, Rule 2-12.4. We therefore decline to consider this assignment of error.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[24] and State v. Weiland.[25] One error patent is noted.
The transcript of the habitual offender sentencing shows that the trial judge properly denied Jefferson the benefit of probation and suspension of sentence, as provided by LSA-R.S. 15:529.1 However, the commitment shows that the judge also denied defendant parole eligibility. The denial of parole eligibility would make defendant's sentence illegal. Where there is a conflict between the transcript and the minute entry, the transcript prevails.[26] *944 We therefore order the commitment amended to conform with the transcript. In all other respects, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] It does not appear that the trial court issued a ruling on the motion to suppress the identification.
[2] The trial court's order granting appeal is dated December 12, 2001. It appears, however, that use of 2001 in the document instead of 2002 is a typographical error.
[3] Mr. Hall's first name is spelled "Jonahs" throughout most of the record. However, an affidavit executed by Mr. Hall and contained in the record shows that Mr. Hall actually spells his name "Jonas." (First Supplemental Record, p. 9).
[4] State v. LaCaze, 99-0584, p. 21 (La.1/25/02), 824 So.2d 1063, 1079, fn. 37, cert. denied, 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002).
[5] State v. Fontana, 396 So.2d 1251, 1252 (1981).
[6] State v. Fletcher, 02-707, p. 5 (La.App. 5 Cir. 12/30/02), 836 So.2d 557, 559, writ denied, 03-0409 (La.10/10/03), 855 So.2d 334.
[7] Uniform Rules Courts of Appeal, Rule 2-12.4; State v. Blank, 01-564, pp. 10-11 (La. App. 5 Cir. 11/27/01), 804 So.2d 132, 139.
[8] See also, LSA-C.Cr.P. art. 731.
[9] Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).
[10] State v. Rodriguez, 02-334, p. 13 (La.App. 5 Cir. 1/14/03), 839 So.2d 106, 117, writ denied, 03-0482 (La.5/30/03), 845 So.2d 1061, cert. denied, ___ U.S. ___, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003).
[11] State v. Hogan, 404 So.2d 488, 489 (La. 1981).
[12] See, LSA-C.Cr.P. art. 709; State v. Snyder, 98-1078, pp. 35-36 (La.4/14/99), 750 So.2d 832, 858.
[13] 00-858 (La.App. 5 Cir. 10/31/00), 772 So.2d 249, writ denied, 00-3244 (La.10/12/01), 799 So.2d 495.
[14] Luna, 00-858 at p. 16, 772 So.2d at 257.
[15] 00-1013 (La.App. 5 Cir. 11/27/01), 803 So.2d 131, writs denied, 02-0362 (La.12/19/02), 833 So.2d 336, and 02-0209 (La.2/14/03), 836 So.2d 134,
[16] 96-2667, pp. 46-47 (La.10/20/98), 737 So.2d 660, 684-685, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999).
[17] LSA-C.Cr.P. art. 881.1.
[18] State v. Dillon, 01-906, p. 4 (La.App. 5 Cir. 2/26/02), 812 So.2d 770, 773, writ denied, 02-1189 (La.4/21/03), 841 So.2d 779.
[19] State v. Zaldivas, 02-0690, p. 9 (La.App. 5 Cir. 12/30/02), 836 So.2d 577, 583, writ denied, 03-0705 (La.10/17/03), 855 So.2d 757.
[20] LSA-C.Cr.P. art. 881.4(D); State v. Richmond, 98-1015, p. 8 (La.App. 5 Cir. 3/10/99), 734 So.2d 33, 38.
[21] LSA-R.S. 14:67(B)(1); LSA-R.S. 15:529.1(A)(1)(c)(i).
[22] A sentencing judge may consider not only convictions, but past criminal behavior which did not result in a conviction. State v. Anderson, 02-273, p. 7 (La.App. 5 Cir. 7/30/02), 824 So.2d 517, 522, writ denied, 02-2519 (La.6/27/03), 847 So.2d 1254; State v. Gilbert, 00-1822, p. 5 (La.App. 5 Cir. 5/16/01), 788 So.2d 574, 577.
[23] LSA-C.Cr.P. art. 841.
[24] 312 So.2d 337 (La.1975).
[25] 556 So.2d 175 (La.App. 5 Cir.1990).
[26] State v. Lynch, 441 So.2d 732, 734 (La. 1983).