862 So.2d 108 (2003)
STATE of Louisiana
v.
Bernard WILLIAMS, Jr.
No. 03-KA-571.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 2003.
*109 Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, LA, for Defendant-Appellant, Bernard Williams, Jr.
Paul D. Connick, Jr., District Attorney, Thomas J. Butler, Terry M. Boudreaux, Assistant District Attorneys, Appellate
*110 Counsel, Kia Habisreitinger, David P. Wolff, Assistant District Attorneys, Trial Counsel, Gretna, LA, for Plaintiff-Appellee, The State of Louisiana.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
Bernard Williams, Jr. appeals his conviction of forcible rape and his life sentence entered pursuant to a three-felony habitual offender determination. We affirm the conviction and the sentence, but remand for correction of a patent error.
On January 13, 2000 a Jefferson Parish grand jury indicted defendant, Bernard Williams Jr., for the November 5, 1999 forcible rape of C.K.[1] La.R.S. 14:42.1. Defendant was arraigned on January 19, 2000 and pleaded not guilty.
On June 2, 2000, defendant filed omnibus pretrial motions, including discovery motions and motions to suppress evidence, confession and identification. The State satisfied discovery on August 31, 2000. On November 2, 2000, a hearing was held on defendant's motions to suppress. The trial judge denied the motion to suppress evidence on the day of the hearing, but held open the hearing on the motion to suppress identification. The hearing on the motion to suppress identification resumed on January 11, 2001, after which the trial judge denied the motion.
On July 13, 2001 the State filed a Notice of Intent to Use Other Crimes Evidence. After a hearing on August 22, 2001, the matter was taken under advisement. On September 12, 2001, the other crimes evidence was found to be admissible at defendant's trial. Defendant sought supervisory writs with this Court. We issued an order staying the trial pending our decision on defendant's writ application. We subsequently granted the writ application and rendered reasons, finding the evidence to be inadmissible and reversing the ruling of the trial court. State v. Williams, 01-1124 (La.App. 5 Cir. 11/2/01) (unpublished writ disposition). The State sought supervisory writs, which the Louisiana Supreme Court denied with a five-judge majority. State v. Williams, 2002-KK-0023 (La.2/1/02), 807 So.2d 847.
The case was tried before a twelve-member jury on April 23-25, 2002. The jury found defendant guilty as charged of forcible rape. The jury was polled and the verdict declared legal.
On June 13, 2002, defendant filed a Motion for New Trial, which was denied that date. In addition, on that date, after waiving delays, the defendant was sentenced to serve 40 years of imprisonment at hard labor without benefit of parole, probation or suspension of sentence, but with credit for time served. The defendant made an oral motion for appeal, which was supplemented with a written appeal motion.[2] He also notified the court of his intent to file a motion to reconsider sentence.[3] Thereafter, the State filed a habitual offender bill alleging the defendant was a third-felony offender. La.R.S. 15:529.1. The defendant denied the allegations of the multiple bill.
On August 6, 2002 the habitual offender hearing was held, after which the trial judge found defendant to be a third-felony *111 offender. Following arguments regarding sentencing as a multiple offender, the trial judge ruled in favor of the State and applied the provisions of La.R.S.15:529.1, as that statute existed at the time of the current offense (i.e., prior to its amendment by Louisiana Acts No. 403 of 2001). The defendant objected to the ruling.
The trial judge vacated the prior sentence and re-sentenced defendant as a multiple offender to life imprisonment without benefit of parole, probation or suspension of sentence.[4] The defendant notified the court of his intent to file a written motion for reconsideration of sentence.[5] Defendant also noted that he had previously filed an appeal motion, and expressed his intent the motion for appeal incorporate the issue concerning the multiple bill.[6]

FACTS
At the time of this incident in November 1999, C.K. was living in an apartment in Metairie and she was working at the Rib Shack Restaurant in Kenner. She was the mother of a three and one-half-year-old son named Troy, who lived with his father, Parker, and grandmother, Ms. Carolina.
In 1999, while working at the Rib Shack Restaurant, C.K. met the defendant, Bernard Williams, who was a regular customer of the restaurant. Williams' mother was a friend of the restaurant's co-owner.
In order to get to work, C.K. traveled by cab, bus, or caught a ride with someone she knew. C.K. would often ride with her boyfriend, Will, or her boss, David Owens. However, around the time of this incident, Will was experiencing car trouble.
In October of 1999, C.K. was waiting at the bus stop and the defendant drove up and offered her a ride. She told him to call her at work in case she needed a ride that night. That night, the defendant, whom C.K. regarded as a friend, picked her up from work. C.K. had offered to babysit for the defendant because he had a young daughter, J.W., and a mentally-challenged sister.[7] Defendant accepted the offer.
Defendant took C.K. to his house in the 2300 block of California Street in Kenner. Defendant was going out with friends and indicated he would not be late. He stayed out all night, however, and C.K. fell asleep on the couch. When she awoke, the defendant was asleep on a mattress on the floor. The defendant awoke, dressed and brought C.K. to work.
On November 5, 1999, C.K. waited for the bus in front of the LaQuinta Inn at the corner of Williams Avenue and Veterans Highway in order to go to work. Defendant drove up and asked C.K. if she needed a ride to work. According to C.K., she believed the defendant took her to work that day but she was not certain. The defendant called her later that day, as C.K. had requested, in order to ascertain if she needed a ride home from work. She accepted a ride from him that night when she left work at about 10:00 p.m.
When the defendant met C.K. that night, he asked her if she would babysit for him again and she refused. The defendant told C.K. to come with him back to his house so that he could try to find a *112 babysitter. Once at his house, C.K. told defendant she could not wait any longer, so he called a cab for her. According to C.K., the defendant's sister was in the back room of the house and his daughter was in the kitchen, but after the defendant called the cab for her, he sent his daughter to her room.
After the defendant called the cab for C.K., he then twice attempted to touch her on the thigh and she told him to take his hands off of her. Defendant threw C.K. on the ground and pulled down one leg of her pants. C.K. was protesting and saying "No." According to C.K., defendant responded, "I guess I consider this another rape charge."
C.K. testified the defendant had her pinned down; she was crying and trying to fight the defendant off by pushing him away. Her efforts failed and the defendant was able to penetrate her vagina with his penis. According to C.K., the assault did not last long because the defendant stopped when the cab blew its horn. C.K. indicated that, following the rape, the defendant offered to bring her home, as if nothing had happened. C.K. was very upset but tried to stay composed for the cab ride to her apartment. According to C.K., the defendant laughed when he saw her crying.
Following the rape, C.K. said she felt compelled to see her son, Troy, because she was contemplating suicide and seeing him would prevent her from doing it. C.K. called Troy's father to tell him she was coming to their house on Stroelitz Street in New Orleans to see her son. She arrived, by cab, before midnight. C.K. confided in Ms. Carolina, Troy's grandmother, that she had been raped. Troy's father, Parker, called the New Orleans Police Department.
Officer Robert May of the New Orleans Police Department Special Operations Division responded to the call. According to Officer May, the victim was sobbing and trying to catch her breath during the interview. C.K. reported to Officer May that she needed a ride home from work and got a ride with a co-worker, who took her to his house and raped her. Officer May called Kenner Police, after learning the rape occurred in Kenner. The Kenner Police were asked to send someone to meet the victim at Charity Hospital in New Orleans. Officer May drove the victim and Ms. Carolina to Charity Hospital.
Detective Shane Tilford of the Kenner Police Department met the victim at Charity Hospital, to investigate the rape. According to Detective Tilford, he spoke to C.K. who was at a loss for words. The officer questioned C.K. concerning the location of the rape and established that it had occurred on California Street in Kenner and the assailant was a black male named Bernard.
Upon establishing the jurisdiction of his department, Detective Tilford contacted his headquarters to arrange for a meeting with Detective Michael Cunningham. Detective Tilford took C.K. there for the interview.
Detective Cunningham took a statement from C.D. concerning the rape. In the statement C.K. gave a description of her assailant, provided a first name, and indicated that she could identify his house. Detective Tilford took her to California Street, where she pointed to the house at 3718 California Street in Kenner as the location of the rape. With this information and the description of her assailant, Detective Cunningham compiled a photographic lineup.
On November 6, 1999 at approximately 3:30 p.m., C.K. viewed the lineup photographs and identified defendant as the perpetrator. She indicated to the officer *113 that she was positive that this was the rapist. She thereafter initialed and dated this photograph.
On November 8, 1999, Detective Cunningham secured an arrest warrant for defendant's arrest. The officer went to the defendant's house, but no one answered the door. Upon interviewing a next-door neighbor, Lori Elmer, the detective determined that the defendant was in fact at home and that Elmer was caring for the defendant's daughter, J.W. At that time, Detective Cunningham questioned J.W.
Detective Cunningham then knocked again at defendant's door and called for him. After receiving no response, the officer made a forced entry into the residence and arrested Bernard Williams.
Detective Cunningham interviewed the defendant's daughter, J.W., in the presence of her aunt and also took a taped statement from her. According to the officer, the two statements given by the child were consistent. The child (who was ten years old at the time of the incident) stated her father told her to go into her room. While in her room with the door open, watching television, J.W. heard C.K. crying and screaming. J.W. went to the hallway to see what was happening. According to the child, she saw her father on his knees "hurting" C.K., while C.K. was fighting and saying, "No, Bernard, stop." J.W. returned to her room with the door open and she reported hearing C.K. screaming, fighting, crying and saying, "No." The child stated that C.K. had said that she (C.K.) was never coming back again. J.W. later testified to the same facts at trial.
On November 11, 1999, C.K. was examined by Dr. Stephen Cohen, an Ob/Gyn physician at Lakeside Hospital. The victim indicated an acquaintance rape had occurred during which her assailant penetrated her vagina with his penis. The physical exam revealed a redness behind the victim's right ear which was compatible with a bite mark. Dr. Cohen also noted that C.K. was suffering emotional trauma. The genital exam was negative for trauma. However, Dr. Cohen explained this finding by stating that it was not unusual because he was dealing with an adult female victim who had previously experienced childbirth. He concluded that the findings in this case were consistent with the reported history.
At trial, the defendant testified as the only witness in his own behalf. He denied C.K.'s account of the rape. Williams admitted he had vaginal sexual intercourse with C.K. on November 5, 1999, but according to defendant, C.K. was a willing participant in the sexual act. He also indicated that he and the victim had consensual sexual intercourse on the prior occasion when she came to his house to babysit.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant asserts the trial court erred in allowing testimony regarding the facts and circumstances of defendant's prior conviction.
Defendant contends that where it had been previously established that the "other crimes" evidence was inadmissible, it was error for the trial court to allow the defendant to be cross-examined regarding his prior convictions. He further argues that the error was not harmless.
The State responds that the questions by the prosecutor were an attempt to impeach the defendant and were calculated to discover whether he was testifying truthfully. In addition, the State contends if there is any error, it is harmless.
In the 2001 regular legislative session, the Legislature enacted La.C.E. art. 412.2 for the purpose of allowing evidence of *114 another offense(s) in sexual assault cases or in cases involving sex offenses against minors regardless of whether the charged offense is a general intent or specific intent crime.[8]
La.C.E. art. 412.2 provides in pertinent part:
A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another sexual offense may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
If a defendant chooses to testify, as in the present case, La.C.E. art. 609.1 authorizes credibility testing with evidence of prior criminal convictions.[9] La.C.E. art. 609.1 governs an attack on a witness's credibility through evidence of a criminal conviction. In pertinent part, it provides as follows:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
C. Details of convictions. Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:
(1) When the witness has denied the conviction or denied recollection thereof;
(2) When the witness has testified to exculpatory facts or circumstances surrounding the conviction; or
(3) When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury....
In pretrial proceedings in this case, the trial court ruled evidence of other crimes was admissible at the defendant's trial. That ruling was reversed by this Court.[10] In our written reasons we found that La.C.E. art. 412.2 governs this case. In addition, the introduction of the other crimes evidence was controlled by the requirements of Prieur and the balancing test of La.C.E. art. 403.[11]
In applying these principles to the current case, this Court found the other crimes evidence to be inadmissible for purposes of proving system or pattern because the other crimes evidence did not meet the relevancy requirements of La. C.E. art. 412.2, did not show system or *115 pattern and was not probative of whether the current incident was consensual.
The Louisiana Supreme Court denied writs.[12]
At trial, during the direct examination of the defendant, he was asked if he had any felony convictions and he replied that he did. He was asked to tell the jury what he had been convicted of. Defendant testified that he had been convicted of sexual battery and "at the same time" he had two felony thefts in 1990 to which he pleaded guilty. He was asked if he had another conviction in 1994 and he replied that he had another conviction for possession of cocaine. He was next asked if he pleaded guilty to that offense and he replied that he had.
During cross-examination, the prosecutor asked defendant if he was honest and truthful, and defendant said he was. The prosecutor next asked him whether he told his attorney he only had two prior felony convictions. Defense counsel objected and, at a bench conference, the prosecutor was admonished not to get into any area dealing with privileged communications.
In resuming cross-examination, the prosecutor asked defendant if he had four convictions and he said yes. The prosecutor then asked defendant if he did not have just two convictions and defendant stated, "They ran them together." Defendant then explained that they "ran them consecutive." Defendant further explained that he pleaded guilty to the theft charges and the sexual battery and it was three charges.
The prosecutor then asked specifically about the theft charges to which he pleaded guilt on September 16, 1990, specifically, case number 90-2905 (two felony thefts from Macy's in the amount of $360). The prosecutor also asked about a theft charge in case number 89-2801 for $360 from Canal Villere, on September 10, 1990. The defendant admitted he pleaded guilty to each of these offenses. The prosecutor then asked if he pleaded guilty to possession of cocaine in case number 94-1591 and he said he did. The prosecutor also asked defendant if he pleaded guilty to sexual battery on June 26, 1991 in case number 90-3534. The defendant stated that he did and added that he had paid his debt to society, too.
The prosecutor then asked if the defendant was a thief, at which point defense counsel lodged an objection. The trial judge told the prosecutor to move on, because that question had been asked and answered.
The prosecutor asked if the defendant had registered as a sex offender. Defense counsel lodged an objection. The court overruled the objection and the defense noted an objection to the ruling. The prosecutor continued with the line of questioning and asked if defendant registered as a sex offender; the defendant said no, he did not think that law applied to him.
The prosecutor asked if defendant, as an honest man, disclosed this fact or hid it. Defendant stated that he would answer the question if asked of him, but he would not volunteer the information. Defendant was asked if, in his dealings as a businessman, he disclosed to his customers his criminal record. Defendant responded that he would if he were asked but not otherwise.
He was next asked if he worked with children in a job or as a volunteer. He said he did volunteer work with children as an assistant coach of his daughter's basketball team. He denied disclosure of his criminal background to those for whom he coached. He also denied telling the parents *116 of the children he coached, because he said he never had unsupervised contact with the children. He added that those in the neighborhood knew about his "trouble in '90," "understood the nature [of] the trouble I got in and it wasn't for kids." He also added, "When I was younger, I never did anything to a little kid." The prosecutor then asked defendant who Gertrude Williams was; the defendant said she is said a friend. He was asked her age and defense counsel objected.
At a bench conference, defense counsel objected to the entire line of questioning. The court asked who was Gertrude Williams and the prosecutor explained that she was the 15-year-old victim defendant raped at the gym where he coached. The prosecutor added that defendant pleaded guilty to sexual battery in that case. The defense objected to the prosecution going into the background of the sexual battery charge.
The judge noted that defendant had denied improper contact with children, yet this victim (Gertrude Williams) was 15 years old. The judge thereafter ruled that the prosecutor could ask one or two questions "to establish that the victim in that case was, in fact, a fifteen year old." The judge also explained, "What I'm allowing you to ask is impeaching his statement that that prior conviction didn't involve children." The judge added, "It's also directly relevant to impeach his testimony because it contradicts directly what he said during his cross-examination."
Defense counsel objected to the ruling and moved in advance of the additional questions for a mistrial, which was denied by the court only insofar as this ruling.
When questioning resumed, defendant again testified that Ms. Williams was a friend, a "close friend." Over defense counsel's objection, defendant responded affirmatively when asked if Gertrude Williams was the subject of that sexual battery. When asked this victim's age, defendant said he didn't know her age at the time and later found out she was 16 or 15. He then stated she was 15 and he was 21 years old.
Defendant was asked if he was being truthful with the jury about not having a sex offense with a child and he said he was truthful. He was asked to explain that and he replied that he knew the victim from school, but did not know her age, and said that when he found out they tried to incarcerate him. He said a proposal was made to give him credit for time served and he "pleaded guilty to get the whole thing over with." Defendant thereafter admitted to the commission of this sexual battery and to pleading guilty because he was guilty.
Thereafter, the prosecutor asked the judge for a ruling on whether he could ask additional questions based upon the defendant's testimony. Defense counsel objected to the question being asked in front of the jury and moved for a mistrial on the basis of the line of questioning. A bench conference ensued, during which the trial judge gave the following reasons:
The Court:
First, let me deal with the objection that's been made. The defendant took the stand and has been answering questions on cross examination. I was very specific in what I was going to allow the ADA to do and that was only to rebut or impeach him with his statement about that offense. And the record will reflect what it reflects. But under 609.1, I find that he was attempting to testify to exculpatory facts or circumstances about that and minimize that.... [H]e went further and he went into facts about that prior conviction. And if those facts are in the opinion of the State untruthful, *117 then they have a right to, again, only ask very specific, very targeted questions designed to impeach those facts that this defendant brought up. And that's all you're allowed to do. Do you understand that ...?
Thereafter, the court inquired as to the State's next question and was informed that the State intended to establish what the original charge was in the sexual battery case and that there was a plea. The court ruled that the prosecutor would not be allowed to ask those questions. The judge also denied defendant's motion for mistrial.
On appeal, defendant contends that once he admitted to the prior convictions, it should have been the end of the inquiry by the State. He alleges that the State's line of questioning was calculated to circumvent the prior ruling concerning the inadmissibility of the other crimes evidence, by hammering away with different types of questions concerning the prior conviction until he said something exculpatory. La. C.E. arts. 412.2(A) and 609.1(C)(2).
The first line of questions by the prosecutor regarding the number of convictions, the nature of the convictions and the dates thereof was clearly countenanced by La.C.E. art. 609.1(C), which allows evidence concerning the admissibility of "the fact of the conviction, the name of the offense, and the date thereof."
The prosecutor's next line of questioning concerned whether the defendant had registered as a sex offender and his disclosure of this fact, as a man of truthfulness and honesty,[13] which he had previously testified he was.
Registration as a sex offender is a sentencing requirement, which would be admissible under La.C.E. art. 609.1(C). See, La.R.S. 15:540, et seq. The inquiry regarding defendant's disclosure of his sex offender status to others was permissible to impeach his prior testimony that he was a man of truthfulness and honesty. In responding to this inquiry, defendant explained that the reason he did not disclose his status as a sex offender to the parents of the children he coached was because he never had unsupervised contact with children and the nature of the trouble he had gotten into "wasn't for kids." He added that "I never did anything to a little kid." Defense counsel objected to the State's inquiry regarding the age of the victim in his sexual battery case on the basis that this amounted to the State being allowed to go into the details of the conviction.
Since defendant admitted the felony offenses on direct examination, the details of the offense were not generally admissible. However, defendant's response on this subject offered exculpatory facts as his explanation as to why he did not disclose his prior sexual offense. The trial judge correctly found the evidence was admissible under La.C.E. art. 609.1(C)(2), an exception to the general rule.
In the final series of questions, defendant was asked if Gertrude Williams was the victim of his sexual battery and he confirmed she was. He was next asked her age and he said 15 or 16, but later admitted she was 15 and he was 21. Thereafter, he attempted to explain away his culpability and gave exculpatory information. Defendant also delved into the facts of that case as he perceived them. This line of questioning was admissible under La.C.E. art. 609.1(C)(2) and the trial judge correctly so ruled.
*118 Accordingly, we find no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant contends the trial court used the incorrect multiple bill sentencing law.
Defendant argues, as he did in the trial court, that since he was not sentenced as a multiple offender until after the effective date of the amendment of La.R.S. 15:529.1 by 2001 La. Acts No. 403, he should have received the benefit of that enactment. He relies on the rationale expressed by the First Circuit Court of Appeal in State v. Parker, 02-1477 (La.App. 1 Cir. 3/5/03), 845 So.2d 546.
The State replies that this Circuit has settled that the applicable version of the Habitual Offender Statute is the sentencing provision that exists on the date of the commission of the underlying offense. La. R.S. 15:529.1.
In State v. Parker, supra, a divided panel of the First Circuit found that a defendant who committed an offense prior to the enactment of 2001 La. Acts No. 403, but was adjudicated and sentenced as a multiple offender after the effective date of the enactment, was to receive the benefit of this enactment.
In reaching this decision, the First Circuit first differentiated their case from the Louisiana Supreme Court's decision in State v. Sugasti, 01-3407 (La.6/21/02), 820 So.2d 518, and analogized Parker's situation to the one in State v. Mayeux, 01-3195 (La.6/21/02), 820 So.2d 526.
In Sugasti, which involved a conviction for possession in violation of La.R.S. 40:966(C)(1), the supreme court held that the time of the commission of the offense is determinative of the penalty provision applicable to the defendant. Although Sugasti was sentenced after the effective date of 2001 La. Acts No. 403, § 4, the amendment was inapplicable to his sentence because the commission of his offense occurred prior to the effective date of the amendment.[14]
In distinguishing Sugasti (which involved an original sentence) from Parker (which involves a multiple offender sentence), the First Circuit initially noted that the multiple offender statute does not impose a sentence for a particular offense and there is no one offense that is determinative of the penalty, but a combination of offenses must meet certain criteria. Additionally, the First Circuit recognized that a defendant may never have a sentence enhanced, although he commits a number of qualifying offenses.[15]
Hence, the First Circuit reasoned that the adjudication date is determinative of the applicable penalty provision for multiple offenders.[16] In this regard, the First Circuit analogized Parker to the Louisiana Supreme Court's decision in State v. Mayeux, supra.
In Mayeux, which involved a fourth-offense DWI, the supreme court held that because of three specific provisions in 2001 La. Acts 1163, which amended La. R.S. 14:98, the amendment was effective upon conviction, and not upon the commission of the offense. The specific provisions of the amendment upon which the supreme court relied in Mayeux were that "upon conviction" the defendant shall be sentenced to a specific termthe language that indicated the legislature favored treatment over incarceration and that granted potential relief to those already *119 convicted to be allowed to participate in home incarceration.[17]
We find the reasoning in Parker misplaced. The amendment to the sentencing provision of the multiple offender statute (La.R.S. 15:529.1) was embodied in 2001 La. Acts 403, which was interpreted by the Louisiana Supreme Court in Sugasti, supra. The amendment to the sentencing provision of the Habitual Offender Statute did not arise under 2001 La. Acts 1163. It was 2001 La. Acts 1163 that amended La.R.S. 14:98 (which provides graduated sentencing penalties for initial and subsequent DWI offenses). 2001 La. Acts 1163 was interpreted by that court in Mayeux, supra. Moreover, the decision in Mayeux was driven by the specific language of 2001 La. Acts 1163. This language in the Act was determinative of the decision to apply that amendment from the date of conviction and not the date of the offense.[18]
In contrast to Parker, supra, this Court has consistently held that the date of the commission of the offense controls the penalty to be applied in multiple offender sentencing. From our earliest decisions on the subject[19] until our more recent pronouncement[20], we have been unwavering on this issue.
In additional, the Louisiana Supreme Court appears to agree with our approach. In a recent per curiam decision,[21] the supreme court cited State v. Flagg, supra, and State v. Harris, 02-873, pp. 2-5 (La. App. 5 Cir. 1/28/03), 839 So.2d 291, granted the writ, and remanded the matter to the district court for "imposition of sentence in accord with the sentencing statutes in force at the time of the offense," with the following reasons:
Under the rule set out in Louisiana jurisprudence, the changes mandated by 2001 La. Acts 403 do not apply to sentences imposed for crimes committed before the act's effective date.... Operation of this rule extends to habitual offender sentences imposed pursuant to R.S. 15:529.1.
State v. Barnes, 845 So.2d at 354 (citations omitted).
Therefore, we deem the issue settled. Where, as here, the amendment of the sentencing provision of the Habitual Offender Law (La.R.S. 15:529.1, as amended by 2001 La. Acts 403) became effective after the date of commission of the instant offense, the amendment to the habitual offender sentencing provisions does not apply to the habitual offender sentence imposed. Therefore, in this case the trial court correctly found the habitual offender sentence imposed under the pre-amendment version of La.R.S. 15:529.1 applicable.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent and the review reveals two patent errors in this case.[22] First, defendant's motion *120 for appeal was premature when it was filed after his conviction and imposition of the original sentence, but before the multiple offender adjudication and sentence. However, this procedural defect was cured by the subsequent resentencing.[23]
Second, the defendant was charged and convicted of a "sex offense" as defined by La.R.S. 15:542(E). La.R.S. 15:540, et seq. requires registration of sex offenders. However, the trial judge did not provide written notification of the registration requirement of La.R.S. 15:542, as required by La.R.S. 15:543(A).[24]

DECREE
For the foregoing reasons, the conviction and sentence are affirmed. We remand the case and direct the trial court to send written notice to the defendant of the registration requirement and to file a copy of the notice in the record.
CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR CORRECTION OF PATENT ERROR.
NOTES
[1] In accordance with La.R.S. 46:1844, the victim will be referred to by the use of initials in order to protect her identity.
[2] The issue of the appeal's prematurity will be discussed as an error patent.
[3] No written motion to reconsider sentence appears in the record.
[4] The restriction of parole for the full term of the sentence constitutes an error patent, which will be discussed infra.
[5] No such motion appears in the record on appeal.
[6] Although the defendant informed the court that he would amend the motion for appeal, there is no evidence of such an amendment in the record on appeal.
[7] In his testimony the defendant stated his sister has cerebral palsy and is bedridden.
[8] State v. Zornes, (on remand) 34,070, p. 4 (La.App. 2 Cir. 4/3/02), 814 So.2d 113, 115, writ denied, 02-1280 (La. 11/27/02), 831 So.2d 269. (The enactment was in direct response to the Louisiana Supreme Court's decision in State v. Kennedy, 00-1554 (La.04/03/01), 803 So.2d 916. State v. Zornes, 814 So.2d at 114, n. 1.)
[9] State v. Johnson, 94-1379 (La. 11/27/95), 664 So.2d 94, 99; State v. Smothers, 02-277, p. 21 (La.App. 5 Cir. 12/30/02), 836 So.2d 559, 568.
[10] State v. Williams, 01-1124 (La.App. 5 Cir. 11/2/01) (unpublished writ disposition).
[11] State v. Cotton, 00-850 (La. 1/29/01), 778 So.2d 569, 578 (citing State v. Prieur, 277 So.2d 126 (La.1973)).
[12] State v. Williams, 02-23 (La.2/1/02), 807 So.2d 847.
[13] Credibility was a pivotal issue in this case since the testimony of the defendant and victim was in conflict as to the nature of their sexual encounter. La.C.E. art. 607.
[14] State v. Sugasti, 820 So.2d at 520-521.
[15] Parker, 845 So.2d at 550.
[16] 845 So.2d at 550-551.
[17] Mayeux, 820 So.2d at 529-530.
[18] Mayeux, 820 So.2d at 529-530.
[19] State v. Flagg, 01-965 (La.App. 5 Cir. 03/26/02), 815 So.2d 208, 210-211, and State v. Ventress, 01-1165 (La.App. 5 Cir. 4/30/02), 817 So.2d 377, 380-383.
[20] State v. Bates, 03-352, p. 11 (La.App. 5 Cir. 7/29/03), 853 So.2d 71. A check of this Court's case management system reflects that a pro se writ application to the Louisiana Supreme Court was made in that case on September 2, 2003.
[21] State v. Barnes, 02-2059 (La.4/4/03), 845 So.2d 354.
[22] La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[23] State v. Balser, 96-443 (La.App. 5 Cir. 11/14/96), 694 So.2d 351, 354.
[24] State v. Stevenson, 00-1296 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165.