975 So.2d 60 (2007)
STATE of Louisiana
v.
Leroy A. DAVIS.
No. 07-KA-544.
Court of Appeal of Louisiana, Fifth Circuit.
December 27, 2007.
*62 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Assistant District Attorney, Twenty-Fourth Judicial District, *63 Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, Louisiana, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, CLARENCE E. McMANUS, and FREDERICKA HOMBERG WICKER.
THOMAS F. DALEY, Judge.
Defendant, Leroy A. Davis, appeals his conviction of two counts of armed robbery, violations of LSA-R.S. 14:64. On appeal he argues that the trial court failed to provide him with a neutral and impartial translator, thus requiring a mistrial, and that the sentence imposed by the trial court was illegal and unduly excessive. In a pro se supplemental brief, defendant also argues that the evidence was insufficient to sustain the conviction of armed robbery of Jessica Ponthieux. We affirm.
PERTINENT PROCEDURAL HISTORY
On October 10, 2005, the Jefferson Parish District Attorney's Office filed a Bill of Information charging the defendant, Leroy A. Davis, and Amanda I. Allemand in count one with armed robbery, a violation of LSA-R.S. 14:64. In count two, Davis, Allemand, and Katie M. Dematteo were charged with armed robbery, a violation of LSA-R.S. 14:64.
After a three-day trial, Leroy A. Davis was found guilty as charged on both counts. The trial court sentenced the defendant, Leroy Davis, on count one to 40 years at hard labor, and on count two to 20 years at hard labor. Both sentences were to be served consecutively and without benefit of parole, probation, or suspension of sentence. On the same day, the State filed a multiple offender bill alleging the defendant to be a fourth felony offender. After the hearing on the multiple offender bill, the trial court found the defendant to be a fourth felony offender. Subsequently, the trial court vacated the defendant's sentence originally imposed on count one, and sentenced the defendant to 99 years at hard labor without benefit of probation or suspension of sentence to run concurrently with his original sentence in count two.[1]
FACTS
Count one:
Jessica Lynn Ponthieux, the victim of the first robbery, testified that she knew both Leroy Davis and Amanda Allemand prior to being robbed by them, and that they had done drugs together on several occasions.
On the night of July 12, 2005, Jessica Ponthieux gave Amanda Allemand a ride home. While she was at a stop sign, the defendant, Leroy Davis, jumped into the back seat of Jessica Ponthieux's car. Immediately after Leroy Davis jumped in the car, Amanda Allemand grabbed Jessica's purse and the two fought over it. While Jessica was fighting with Amanda Allemand, defendant, Leroy Davis, reached around from the back seat and cut her on the neck.
Jessica Ponthieux called her boyfriend, David Suddith, during the incident. The defendant, Leroy Davis, and Amanda Allemand *64 ran away after Leroy Davis cut Jessica Ponthieux. Amanda Allemand took Jessica's purse containing $50.00 and her prescription pain medication.
Jessica Ponthieux had no doubt that it was Leroy Davis who jumped in her car, robbed her, and cut her. Later, she identified Leroy Davis and Amanda Allemand in photographic lineups. Jessica was positive of the identifications. Jessica identified Amanda Allemand in court as the person who fought with her and took her purse.
David Suddith testified that, in July of 2005, he and Jessica Ponthieux were living together. Suddith testified that, on July 12, 2005, a woman named Amanda came to the residence he shared with Jessica Ponthieux and requested a ride home. When Jessica called him from the car, Suddith could hear a scuffle. Five or six minutes later, Jessica Ponthieux drove back to Suddith and her residence and screamed, "They cut me. Call 9-1-1". Suddith called 911.
Deputy Steven Sadowski of the Jefferson Parish Sheriff's Office's responded. He interviewed Jessica Ponthieux. He observed that she was extremely upset and emotional, and that she had blood on her clothing and a cut on her neck. Jessica Ponthieux gave Deputy Sadowski the nickname of "Easy" for one of the perpetrators and "Amanda" as the possible first name of the other perpetrator.
According to Deputy Sadowski, she described "Easy" as a black male. Amanda was described as a white female with fever blisters or "something" around her lips.
Count two:
The victim, Maximo Murillo (the cab driver), testified that he started driving his taxicab at 4:00 a.m. on the morning of July 25, 2005. Later that morning, two women on Williams Boulevard waived him down, got in, and asked to be taken to a location on David Drive. He informed the two women that the apartments there were empty, but they still wanted to be taken there.
After they arrived at the apartments, he saw a green 4-Runner Toyota vehicle, which was behind him, pull across the street in front of him. Then he heard someone shout for the two women to search him and take everything from him. One of the two women took his bracelet. The other woman took everything out of his pockets. During this time the defendant, Leroy Davis, who was outside the cab driver's vehicle, shouted at him through the driver's side window telling him to let the women take everything. When he resisted Leroy Davis hit him with an automatic pistol in the chest. Then Leroy Davis opened the cab driver's shirt with his other hand and tore off his chain.[2]
Murillo, the cab driver, testified that the defendant, Leroy Davis, told the two women to get out of his cab, and then Leroy Davis drove away with the two women inside his vehicle. Murillo followed them for one block to get the vehicle's license plate number. When Leroy Davis stuck his pistol out of the window, he took it as a warning and left.
Murillo reported the incident to the police later that morning with the help of his son, Jamie, since he did not speak English well enough to report the incident himself. Murillo gave the police a description of the *65 robbers and location where he was robbed. The police apprehended individuals matching the description of the robbers two hours later. Murillo was called to the scene where he identified both women and the defendant, Leroy Davis. Murillo had no doubt in his identifications of the two women or the defendant. He also identified the defendant, Leroy Davis, in court as the man who hit him and robbed him at gunpoint.[3]
Deputy Gary Soileau of the Jefferson Parish Sheriff's Office testified that he interviewed Murillo about the armed robbery complaint. Murillo's son, Jamie Murillo, accompanied him to translate.[4] Murillo told Deputy Soileau that the armed robbery occurred on the street right behind the electrical plant and close to Skate Country. Murillo told him that the vehicle used in the armed robbery was a green Toyota 4-Runner with a temporary license plate on the back window. In addition, Murillo described the perpetrators.
As part of his investigation, Deputy Soileau checked the location where the armed robbery occurred, but he did not find any evidence. He found a vehicle matching the description given to him by Murillo on Montgomery, four streets over from Eisenhower. Deputy Soileau identified the suspect vehicle by the temporary license tag on the back window. He notified Detective Keith Lacasio, who told him to keep the vehicle under observation until he arrived. When Leroy Davis, Amanda Allemand, and Katie DeMatteo exited a residence and approached the vehicle, Deputy Soileau detained them. He also contacted Murillo to see if he could come to the scene to make an identification.
When Murillo arrived, he identified the defendant, Leroy Davis, and the two women as the individuals who had robbed him. The defendant, Leroy Davis was wearing Murillo's chain. A pocketknife and the key to the Toyota truck were found on Leroy Davis in the search incident to arrest. Deputy Soileau identified the defendant, Leroy Davis, in court as the man he apprehended in connection with the armed robbery, and that Murillo subsequently identified.
Detective Lacasio testified he was briefed and given a description of the armed robbery that occurred on July 25, 2005. He realized that it was similar to another case that occurred two weeks before. The specific description and age of the suspects matched the earlier armed robbery. In addition, he knew an "Amanda" who had a prior conviction. After the arresting officer informed Detective Lacasio that Leroy Davis, the defendant, and Amanda Allemand were taken into custody, he thought they could be the same individuals involved in the July 12, 2005 armed robbery of Jessica Ponthieux.
Later on the same afternoon, Detective Lacasio obtained an audiotaped statement from Jessica Ponthieux, the victim of the July 12, 2005 armed robbery. Detective Lacasio showed Jessica Ponthieux two photographic lineups, one with the defendant, Leroy Davis, and the other with Amanda Allemand. Jessica Ponthieux positively identified the defendant, Leroy *66 Davis, and Amanda Allemand from the photographic lineups.
On the afternoon of July 25, 2005, Detective Lacasio also obtained an audiotaped statement from Leroy Davis in which he admitted to having met Jessica Ponthieux with Amanda Allemand two or three weeks earlier and going to her house on a couple of occasions, but denied any involvement in Jessica Ponthieux's robbery.
Amanda Allemand testified that she had known Leroy Davis for three months by July 25, 2005. He was her boyfriend, and they did drugs together. Her version of events differed from Murillo's. She testified that on the morning of July 25, 2005, at approximately 2:00 a.m., she and the defendant, Leroy Davis, were driving around in a green 4-Runner trying to sell drugs. They were able to use the vehicle on the weekends, as part of a "rock rental.[5]"
Amanda Allemand testified that she had not met Katie DeMatteo before seeing her that morning in the 500 block of Eisenhower Street. She denied flagging down a cab on Williams Boulevard to bring them to the 500 block of Eisenhower. However, Amanda Allemand did see a cab in the 500 block of Eisenhower at 4:30 a.m. that morning. When they stopped behind the cab, the cab driver (Murillo) got out, came over to their vehicle, and spoke to them. She testified that Leroy Davis tried to sell crack cocaine to the cab driver, Murillo.
Amanda Allemand testified that she never saw either the defendant, Leroy Davis or Katie DeMatteo with any money or a wallet. She denied that Leroy Davis pointed a gun or hit the cab driver in the chest with a gun. She also did not see Leroy Davis take anything from the cab driver.
Amanda Allemand testified that she did not take anything from the cab driver. During the 30 minutes that she and the defendant, Leroy Davis, spent on Eisenhower with the cab driver, she and Leroy Davis sold Katie DeMatteo some drugs. Amanda Allemand did not see Leroy Davis stick a gun out of the window when they drove away. When Amanda Allemand, Leroy Davis, and Katie DeMatteo left Eisenhower, they went to the Little Farms area in order for Leroy Davis to "score" drugs. They all used drugs in the vehicle, and then they went to Montgomery Street. An hour later, when she, Leroy Davis, and Katie DeMatteo were leaving the house located at 701 Montgomery, the police arrested them.
Katie DeMatteo testified that she was walking on Airline Drive, under the influence of drugs and alcohol, when Murillo drove his cab next to her. She got into the cab, and they drove to Eisenhower Street, where he paid her for fellatio. According to Katie DeMatteo, Murillo spoke English well enough to get his point across. She testified that while performing oral sex, she took his wallet, but later discarded it on the ground after looking through it. She denied taking anything from it.
Katie DeMatteo testified that, apparently missing his wallet, Murillo pulled his cab next to her again and asked about his wallet, but she denied having it. Murillo got out of his cab, and started to approach her, which intimidated her. When another vehicle stopped behind Murillo's cab, at approximately 4:30 a.m., she waved to get the occupants' attention. Leroy Davis and Amanda Allemand were in the car. After Leroy Davis and the cab driver talked, she told the defendant that she knew the location of the cab driver's wallet. They drove *67 to apartments on Eisenhower, and the cab driver followed. Katie DeMatteo retrieved the wallet and gave it to Leroy Davis. Then Leroy Davis gave it to Amanda Allemand, and then Leroy Davis went to speak with the cab driver.
Katie DeMatteo believed that everything in the cab driver's wallet was returned to him, but she was not sure. She said that the cab driver offered Leroy Davis a reward for the return of his wallet. Leroy Davis returned from the cab holding a chain. Katie DeMatteo did not know if Leroy Davis took the chain from Murillo, the cab driver, or if Murillo gave it to him.
Katie DeMatteo bought drugs for Leroy Davis, Amanda Allemand, and herself. She testified that they drove around for approximately two and a-half hours getting high from using drugs. Eventually, they stopped at a house on Montgomery Street where they smoked crack cocaine. When they were leaving, the police confronted them.
ASSIGNMENT OF ERROR NUMBER ONE
First, defendant argues that the trial court failed to provide him with a neutral and impartial translator, thus requiring a mistrial. Defense counsel failed to make a contemporaneous objection in order to preserve this alleged trial court error for appellate review.
On September 13, 2006, the second day of trial, the prosecutor called the cab driver to testify. The prosecutor informed the court that there would be an interpreter. The court ordered that the interpreter be sworn in. Defense counsel stipulated that the interpreter, Blanca Mejia[6], was a court-approved, certified interpreter for English/Spanish and Spanish/English. Thereafter, the interpreter was sworn into service.
The cab driver completed his testimony on the second day of trial. On the third day of trial, defense counsel raised for the first time an objection to the State hiring an interpreter to translate the cab driver's testimony. Defense counsel moved for a mistrial after arguing that there could "appear some impropriety in that since [sic] the interpreter was employed by the District Attorney's [sic], whether or not her translations or interpretations could in any way been [sic] colored to favor the State or the case of the State."
The prosecutor responded that the District Attorney's office contacted the interpreter through an agency, and that it was paying the agency. The prosecutor contended that there was no rule that required the Court to appoint an interpreter unless there was a pretrial objection or the Public Defender's Office needed an interpreter and could not afford one. In addition, the prosecutor argued that defense counsel was aware before the cab driver testified that the State was paying for the interpreter because he was complaining to defense counsel about how long they would have to wait for her to interpret the testimony. The prosecutor also argued that the defense counsel had an opportunity to examine the interpreter when she was offered as an expert and certified witness in translations.
The trial judge denied the Motion for Mistrial, noting that defense counsel could have examined the witness before she translated for he cab driver, in order to determine who was paying for her services. Instead, defense counsel accepted the interpreter as a certified interpreter.
Defendant, however, alleges that it is not clear he knew of the payment arrangement. The defendant argues that the trial *68 court erred in not granting his Motion for Mistrial. Defense counsel objected after discovering that he was misled in his belief that the translators, both at the suppression hearing and at trial, were court appointed. The defendant contends that because the State paid for the translators they were not absolutely disinterested, unprejudiced, and unbiased, citing State v. Nguyen[7] and State v. Lazarone.[8] In addition, the defendant claims that the court erred in not determining whether the cab driver needed the services of an interpreter, citing State v. Lopes.[9]
The State argues that its employment relationship with the interpreter does not create the presumption of prejudice. The State notes that the interpreter took an oath and was neither a witness nor a party in the case. The interpreter also translated exclusively for the State. The defendant did not receive assistance from the interpreter. Also, there is no evidence in the record suggesting that the interpreter translated statements in error.
A mistrial is a drastic remedy.[10] LSA-C.Cr.P. art. 775 provides the grounds for non-mandatory mistrials. Except when mandatory pursuant to LSA-C.Cr.P. art. 770, a mistrial is warranted only when trial error results in substantial prejudice to defendant depriving him of a reasonable expectation of a fair trial. Id. The determination of whether a mistrial should be granted is within the sound discretion of the trial court. Id. The denial of a Motion for Mistrial will not be disturbed absent an abuse of that discretion. Id.
An interpreter should be a neutral and detached individual whose abilities are screened by the court.[11] When raising a claim of bias, the defendant must make an allegation that the interpreter in the case mistranslated a portion of the testimony or was incompetent.[12] Thereafter, the opposing party bears the burden of proving that the interpreter was biased. Id.
In State v. Lai, supra, an interpreter was brought in by the State for the purposes of translating the State's witnesses' testimony. The defendant did not request assistance from the interpreter. In addition, the interpreter was not a party or a witness, and was sworn by the court. The defendant did not assign any specific prejudice arising out of the interpreter's translations, and there was nothing in the record to suggest that any of the testimony at trial was improperly translated. This Court found no abuse of discretion in the trial court's decision denying the Motion for Mistrial, noting that the record did not reveal that any prejudice had been sustained by the defendant as a result of the interpreter being paid by the State. Therefore, his substantial rights were not prejudiced. State v. Lai, 902 So.2d at 559.
In State v. Lazarone, supra, the Louisiana Supreme Court reversed the defendant's conviction because the interpreter appointed by the trial court was also a witness for the prosecution who had contributed to a fund for the prosecution of the defendant. The court found that, in that case, the interpreter could not be "absolutely disinterested, unprejudiced, and unbiased." State v. Lazarone, 57 So. at 534.
*69 In the present case, as in State v. Lai, supra, the defendant has not claimed any specific prejudice arising out of the interpreter's translations. Rather, the defendant alleges that there could "appear some impropriety" as to whether the translations or interpretations were colored to favor the State's case because the interpreter was employed by the State. There is also nothing in the record to suggest that any of the testimony at trial was improperly translated. The defendant did not request any assistance from the interpreter. The interpreter also was not a party or a witness, and was sworn by the court. Defendant has not made any specific allegations of any prejudice to defendant as a result of the interpreter being paid by the State. Accordingly, we find this Assignment of Error has no merit.
ASSIGNMENT OF ERROR NUMBER TWO
In his second Assignment of Error, the defendant argues that his habitual offender sentence of 99 years at hard labor without benefit of probation or suspension of sentence on count one is excessive. The defendant claims that the trial court did not consider the mitigating factors pursuant to LSA-C.Cr.P. art. 894.1 and LSA-R.S. 15:529.1 in imposing his habitual offender sentence. Specifically, the defendant alleges that the trial court failed to tailor a sentence to him based on the crimes he committed.
The State argues that the defendant's sentence is not excessive nor does it violate the law. The State alleges that in this case the defendant received the mandatory minimum sentence of 99 years without benefits. Since he received the mandatory minimum, the trial court was not required to provide reasons. In addition, the State notes that the defendant has not presented any evidence to support his claim that his sentence is excessive.
The defendant's failure to file a Motion to Reconsider Sentence limits review of his sentence to an examination only for constitutional excessiveness. State v. Crawford, 05-494, p. 4 (La.App. 5 Cir. 1/31/06), 922 So.2d 666, 669.
A trial court is afforded great discretion in determining sentences.[13] "The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." LSA-C.Cr.P. art. 881.4(D). In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice.[14]
The Louisiana Supreme Court has recognized that a mandatory minimum sentence under the Habitual Offender Law may still be reviewed for constitutional excessiveness.[15] Since it is presumed that a mandatory minimum sentence under the Habitual Offender Law is constitutional, a court may only depart from the mandatory sentence if it finds clear and convincing evidence in the present case that would rebut the presumption of constitutionality.[16] *70 The burden is on the defendant to rebut the presumption of constitutionality by showing:
[h]e is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.[17]
Downward departures from the minimum sentence mandated by La. R.S. 15:529.1 should only occur in rare situations.[18] If a downward departure is warranted, the sentencing court must impose the longest sentence that is not constitutionally excessive, with specific reasons as to why this sentence is not constitutionally excessive.[19]
The defendant in this case was convicted of two counts of armed robbery, in violation of LSA-R.S. 14:64. The sentencing exposure for each armed robbery conviction is "imprison[ment] at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence." LSA-R.S. 14:64. After his multiple bill hearing, the defendant was found to be a fourth felony offender. Based on his fourth felony multiple offender status, the defendant's sentencing exposure for imprisonment was 99 years to life without benefit of probation or suspension of sentence. LSA-R.S. 15:529.1(A)(2)(c)(i) and (G). The defendant received a habitual offender sentence of 99 years on count one without benefit of probation or suspension of sentence. Therefore, the defendant received a mandatory minimum sentence.
In State v. Stevenson,[20] the defendant was sentenced to life imprisonment after being found a fourth felony offender following the armed robbery conviction. His predicate convictions were for possession of cocaine with intent to distribute and two convictions for possession of cocaine. The court upheld the defendant's life sentence, finding that the defendant failed to show exceptional circumstances to justify a downward departure from the mandatory 99 year to life sentence he received.
In State v. Johnson, supra, the defendant was found guilty of two counts of armed robbery. After a multiple offender hearing, the defendant was found to be a third-felony offender. His original sentence on one count was vacated and he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, the defendant claimed the trial court erred in failing to follow the sentencing guidelines of LSA-C.Cr.P. art. 894.1 and in imposing a constitutionally excessive sentence. This Court found that compliance with sentencing guidelines was not required because the defendant's sentence was statutorily prescribed under the Habitual Offender Law. In addition, this Court found that the record was devoid of any basis for consideration of a downward departure from the *71 mandatory sentence imposed by the trial court.
In the present case, as in State v. Johnson, supra, the defendant's argument that the trial court failed to consider mitigating factors under LSA-C.Cr.P. art. 894.1 in imposing his 99-year sentence is misplaced. Since his sentence imposed is statutorily prescribed under the Habitual Offender Law, the judge was not required to articulate mitigating factors. In addition, as in State v. Stevenson and State v. Johnson, supra, on appeal, the defendant has made no showing of exceptional circumstances that would justify a downward departure from the mandatory 99-year sentence. There was no evidence presented at the time of sentencing and no argument was made at sentencing regarding the need for a downward departure from the required minimum sentence.
PRO SE ASSIGNMENT OF ERROR NUMBER ONE
In his Pro Se Assignment of Error, the defendant argues that the State failed to prove an essential element of the crime of armed robbery, i.e., that he was armed with a dangerous weapon, beyond a reasonable doubt. The defendant claims that Ponthieux never saw him enter her vehicle with a weapon. In addition, Ponthieux never saw a weapon in his hand "when he reached around her shoulders." The defendant claims that Jessica Ponthieux only thought that he might have used a piece of glass that she later found in her vehicle.
The defendant notes that, according to Detective Sadowski, Jessica Ponthieux did not know how she was cut. In addition, the defendant notes that Detective Sadowski testified that he did not find a knife or "something," i.e., a piece of glass, in her vehicle after the robbery. The crime lab personnel also did not find the piece of glass. Detective Sadowski further did not find any blood in the vehicle.
Pursuant to Jackson v. Virginia,[21] the constitutional standard for testing the sufficiency of the evidence requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[22]
"Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." LSA-R.S. 14:64. A "`[d]angerous weapon' includes any . . . instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." LSA-R.S. 14:2. This term is not limited to those instrumentalities, which are inherently dangerous.[23] A determination of the "dangerousness" of an object is based on the manner in which it is used and is a question of fact for the jury. Id.
Louisiana courts previously have found many and varied objects to be dangerous weapons for purposes of LSA-R.S. 14:64.[24] These objects have included an ink pen; a liquor bottle hidden in a pocket; a metal sign post; a hammer; and a toy gun. Id. When an inherently harmless instrumentality has been used to commit an armed robbery, the jury must find *72 "`that there was an actual likely danger of serious bodily harm to anyone present in the highly charged atmosphere of the scene of a robbery, taking into consideration the great possibility of violence in the interaction between the offender and the victim thereby put in fear of his life.'"[25] The introduction of the weapon at trial is not necessary in an armed robbery prosecution where the State's witnesses can establish, through their observations at the crime scene, all the elements of the charge beyond a reasonable doubt, including the existence and use of a dangerous weapon.[26]
No weapon need ever be seen by the victim, or witnesses, or recovered by the police for the trier of fact to be justified in finding that defendant was armed with a dangerous weapon.[27] When there is no direct evidence establishing that the defendant was armed with a dangerous weapon, in order to convict, the circumstantial evidence must exclude every reasonable hypothesis of innocence, assuming every fact to be proved that the evidence tends to prove. LSA-R.S. 15:438.[28]
In State v. Cotton, supra, this Court held that the evidence was sufficient to support an armed robbery conviction, even though the prosecution did not produce the dangerous weapon used in the robbery at trial. The victim testified that the defendant approached him and pressed a hard, sharp object to his side. The victim thought the defendant had a knife and, therefore, complied by looking straight ahead as he was directed. The defendant then reached into the victim's pocket, took his money, and fled. This Court found that the State submitted sufficient evidence to support the armed robbery conviction, even though the victim did not see a dangerous weapon.
In the present case, as in State v. Cotton, the State did not present a weapon at trial. Jessica Ponthieux testified that she fought with Allemand to get her purse back until she saw blood dripping down in front of her. When Jessica Ponthieux realized that the defendant had cut her on the neck, she let go of her purse. Jessica Ponthieux thought that Leroy Davis may have cut her with the clear piece of glass with blood on it that she later found on the floor in back of her vehicle.
In addition, David Suddith testified that he could hear the scuffle over the telephone when Jessica Ponthieux was being beaten and robbed. Five or six minutes later when Jessica Ponthieux drove back to their residence, she hysterically screamed that they had cut her. Suddith testified that he saw "blood coming down her neck. She was holding it, and it [sic] was blood coming over her hand." Further, Detective Steven Sadowski testified that when he interviewed Jessica Ponthieux he observed that she had blood on her clothing. He opined that the laceration on her neck occurred in a traumatic event.
As in State v. Cotton, supra, the State submitted sufficient evidence to support the armed robbery conviction, even though the victim did not see a dangerous weapon. The circumstantial evidence presented by the State's witnesses was sufficient to *73 justify the jury's finding that defendant was armed with a dangerous weapon.
ERROR PATENT DISCUSSION[29]
A review of the record indicates that the trial judge failed to advise the defendant of the appropriate prescriptive period for filing post-conviction relief as required by LSA-C.Cr.P. art. 930.8.[30] The matter is remanded to the trial court for the court to inform defendant of the appropriate prescriptive period for filing for post-conviction relief by sending appropriate written notice to the defendant within ten days of the rendition of this Court's opinion and by filing written proof that the defendant received the notice in the record.[31]
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] The defendant's original Motion for Appeal was premature when it was filed after his conviction and imposition of the original sentence but before the multiple offender adjudication and sentence. However, the defendant's subsequent resentencing after his multiple adjudication cured this procedural defect. See State v. Williams, 03-571 (La. App. 5 Cir. 11/12/03), 862 So.2d 108, 119-20, writ denied, 04-0051 (La.5/21/04), 874 So.2d 171. In addition, the defendant filed a Motion for Appeal after his multiple offender sentence was imposed.
[2] Murillo's license, airport permit, credit cards, and Social Security card, as well as twenty dollars and his 14-karat gold chain with a "Jesus" pendant were taken. The chain was recovered when the robbers were apprehended. The prosecutor noted during the trial that Murillo was wearing the same chain.
[3] After Katie DeMatteo and Amanda Allemand were brought in the courtroom, Murillo identified them as the two women who were with the defendant.
[4] Jamie Murillo, Murillo's son, testified that his father was in shock when he saw him after the armed robbery. His father's shirt had been ripped off, and his chest looked red and injured where he was hit. He saw the defendant wearing his father's chain when he accompanied his father to make the identification.
[5] A "rock rental" apparently is the use or rental of a vehicle in exchange for drugs.
[6] Ms. Mejia stated that she was also certified in the Federal court system.
[7] 02-410 (La.App. 3 Cir. 10/2/02), 827 So.2d 1248.
[8] 130 La. 1, 57 So. 532 (La.1912).
[9] 01-1383 (La.12/7/01), 805 So.2d 124.
[10] State v. Lai, 04-1053 (La.App. 5 Cir. 4/26/05), 902 So.2d 550, 558, writ denied, 05-1681 (La.2/3/06), 922 So.2d 1175.
[11] State v. Tamez, 506 So.2d at 533.
[12] State v. Nguyen, 827 So.2d at 1252.
[13] State v. Jefferson, 03-820 (La.App. 5 Cir. 1/27/04), 866 So.2d 931, 942, writ denied, 04-0727 (La.9/24/04), 882 So.2d 1166.
[14] State v. Gross, 05-903 (La.App. 5 Cir. 3/28/06), 927 So.2d 583, 585, writ denied, 06-1465 (La.2/16/07), 949 So.2d 408.
[15] State v. Johnson, 01-842 (La.App. 5 Cir. 2/13/02), 812 So.2d 106, 117, writ denied, 02-1037 (La.3/21/03), 840 So.2d 532.
[16] State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 676.
[17] State v. Johnson, 709 So.2d at 676, quoting State v. Young, 94-1636 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 528, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223.
[18] State v. Davis, 01-123 (La.App. 5 Cir. 7/30/01), 792 So.2d 126, 132.
[19] State v. Johnson, 01-0842 (La.App. 5 Cir. 2/13/02), 812 So.2d 106, 118, writ denied, 02-1037 (La.3/21/03), 840 So.2d 532.
[20] 02-769 (La.App. 5 Cir. 1/28/03), 839 So.2d 340, writ denied, 03-833 (La. 10/31/03), 857 So.2d 472.
[21] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[22] State v. Johnson, 04-614, p. 3 (La.App. 5 Cir. 11/16/04), 890 So.2d 19, 23, writ denied, 05-0243 (La.12/9/05), 916 So.2d 1048.
[23] Johnson, 04-614 at p. 6, 890 So.2d at 23.
[24] State v. Cotton, 94-384, p. 2 (La.App. 5 Cir. 11/16/94), 646 So.2d 1144, 1146.
[25] Johnson, 04-614 at p. 6, 890 So.2d at 23, citing State ex rel. Richey v. Butler, 572 So.2d 1043, 1044 (La.1991) (quoting State v. Bonier, 367 So.2d 824, 826-27 (La.1979)).
[26] Cotton, 94-384 at pp. 2-3, 646 So.2d at 1146.
[27] State v. Page, 02-689, p. 16 (La.App. 5 Cir. 1/28/03), 837 So.2d 165, 176, writ denied, 03-0951 (La. 11/7/03), 857 So.2d 517.
[28] State v. Ellis, 95-1005, p. 4 (La.App. 5 Cir. 3/26/96), 672 So.2d 1007, 1009.
[29] The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[30] State v. Simmons, 03-20 (La.App. 5 Cir. 4/29/03), 845 So.2d 1249, 1263.
[31] Id.