MARION F. EDWARDS, Chief Judge.
| gDefendant/appellant, Hung V. Nguyen (“Nguyen”), appeals his conviction of aggravated rape in violation of La. R.S. 14:42 (Count 1) and unauthorized use of a motor vehicle in violation of La. R.S. 14:68.4 (Count 2). He was indicted by the grand jury of these crimes on October 8, 2009. At his arraignment, Nguyen pled not guilty to both crimes.
On February 22, 2010, without objection, the indictment was amended to correct Nguyen’s birthdate and, on that date, Nguyen proceeded to trial. Following trial, a unanimous, twelve-person jury found Nguyen guilty as charged as to both counts. Nguyen filed a motion for new trial, arguing that, among other things, the verdict was contrary to the law and evidence regarding aggravated rape and that the victim’s testimony, which had been contradicted, was the only evidence of the offense. Immediately following denial of the motion, Nguyen waived sentencing delays and was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence for Count 1, and to ten years of imprisonment with the |aDepartment of Corrections for Count 2. The sentences were to run concurrently. This appeal follows.
The victim, N.N., testified (through a Vietnamese interpreter) that she was working at Eva’s (a bar) as a waitress on November 27, 2008 when Nguyen, whom she identified in court, bought her six or seven small bottles of beer. They sat down, talked, and drank beer. Before she drank beer with Nguyen, however, she smelled alcohol on him. He told her that he had been to her boyfriend’s house earlier and had been drinking beer with him. Nguyen asked N.N. if she could take him to her apartment to sleep overnight. N.N. testified that Nguyen was drunk and could not drive his car, so she drove him in her car and brought him to her apartment in Jefferson Parish. She could not recall what time they left, but she knew her shift had started at 9:00 p.m.
After arriving at her apartment, Nguyen asked her if they could open a bottle of wine that was on the table. She testified that they drank the wine, and Nguyen was “coming on” to her. She explained that he wanted to have sex with her, but she did not want to have sex with him. She testified that she and Nguyen talked for over *514 an hour and then he embraced and kissed her. She said she told him he could not do that to her, but he did not stop. Instead, he pushed her down onto the sofa and hit her. She explained that he used one arm to pull her pants down and she was trying to hold his arm while trying to hold her pants. She said that he hit her in her face and that she blocked him when he hit her. She did not know how many times he hit her in her face. She recalled screaming for him not to hit her, but he continued to hit her and eventually pulled her pants down.
According to N.N., Nguyen then put his penis into her vagina and raped her. N.N. testified that she pushed him out, but he hit her in her face with one hand and was holding her arm with his other hand. N.N. said that she told Nguyen he could J^not do that to her and screamed. She said she begged, but he told her to “shut up.” She testified that she did not stop screaming, and she did not stop struggling. She said that she was raped for “a long time.”
N.N. testified that Nguyen put his arm to her neck and made her faint. She did not know how long she remained unconscious, but, when she awoke, she saw that Nguyen was in her bedroom. She ran into her bedroom, still naked, and took her purse from Nguyen. He pushed her down and asked her for her keys. He took her keys from her purse, as well as her phone and some money. She testified that Nguyen ran downstairs and drove away in her car, without saying a word. She said that Nguyen did not have her permission to take her car when he left her apartment.
N.N. put her pants on and went to her neighbor for help. She told her neighbor, Ms. Yung, that she had been hit and raped and asked her neighbor to call her boyfriend. Her neighbor helped her call the police and served as an interpreter once the police arrived, as N.N. does not speak English. N.N. told the police who hit and injured her, stating that she did not know Nguyen’s name before the time she brought him home. She said that her neighbor helped her to find out his name. It appears from other testimony that she provided a partial name and that her neighbor happened to know Nguyen.
N.N. testified that she was shy and afraid. She explained that she did not initially tell the police about the rape, and she waited to disclose the rape when she was at the hospital. At the hospital, she was able to talk to the police through an interpreter. She was sent to a second hospital for a vaginal examination. N.N. testified that she felt pain in her vagina and anus, that her anus felt “very wet,” and she believed that Nguyen had inserted his penis into her anus when she was 15unconscious. N.N. testified that she did not tell the doctor examining her that she was raped anally, but she did tell the doctor that she had pain in both places.
N.N. testified that the photographs presented at trial accurately depicted her condition at the time. She also took photographs of her body, including her leg and neck, with her phone, although it appears these photos were taken days after the rape. She handed the police her phone when she met with them. She testified that the bruises in the photographs were because of Nguyen, who had pushed her and used his legs to push down her legs. She also explained the bruises on her neck, saying “[h]e pushed his arm to my neck and make [sic] me fall and leave [sic] a bruise on my neck.” N.N. testified that, at the time of trial, she still felt pain in the bones around her eyes.
Dr. Phillip Lee Reed, a physician employed by Ochsner Medical Center, was accepted as an expert in the field of emergency medicine. He recalled that a full *515 “history” and a physical of N.N. was performed on November 28, 2008. Dr. Reed explained that he had treated thousands of patients, but he remembered N.N. because the amount and degree of trauma involved in her case had left an impression on him. He believed it was a sad case and recalled having to get a translator involved. A nurse, who was able to speak Vietnamese, was able to get a “history” from her. He believed the photographs presented at trial accurately depicted the victim at the time.
Dr. Reed testified that the patient said she was struck multiple times in her face and chest area with a fist. She reported a loss of consciousness and reported being raped. A physical examination revealed she appeared to have blunt force trauma, particularly concentrated around her facial area. She also had multiple abrasions, contusions, swelling, ecchymosis (bruising), and tenderness on her cheek. A CAT scan was conducted to investigate facial bone fractures and | f,revealed that she had a fracture in the inferior orbital region in the lamina papyraeea.
Dr. Reed testified that N.N. appeared to have trauma to her lip, which was contused and swollen, ecchymosis around her eye, redness and swelling around her eye, and tenderness where the fracture was. She also had trauma to the bridge of her nose. Dr. Reed testified that N.N.’s injuries were consistent with blunt force. Because of the amount of area involved, Dr. Reed believed that the injuries were not consistent with one blow but, instead, resulted from multiple blows. He did not believe one fist could cover all of the area of bruising to her forehead, lip, and both cheeks. He further testified that it was not as likely that N.N.’s injuries resulted from a strike and a fall.
Dr. Reed was questioned as to the level of force necessary to sustain such injuries. He responded that it would have taken a “[pjretty high degree of blunt force to create a fracture in the orbit,” and that it required a good amount of force to break that orbital bone. He testified that the level of trauma could be consistent with the loss of consciousness. After looking at the photographs from the phone, Dr. Reed noted that the injuries were consistent with someone placing a forearm onto the neck and compressing it. Dr. Reed testified that a great deal of force had to have been used to cause this much contusion. He also testified that the injuries to the wrist and legs could be consistent with somebody pinning someone down. After examining N.N., he discharged her and sent her to get a sexual examination.
Dr. Chi Dola, an associate professor at Tulane University School of Medicine and a practicing physician, was recognized as an expert in the field of obstetrics and gynecology. She testified that, on November 28, 2008, she conducted a rape examination on N.N. Dr. Dola testified that the photographs presented accurately depicted N.N.’s physical condition at the time of the 17examination at Tulane Lakeside Emergency Room in Metairie. She believed N.N. was initially evaluated at Meadow-crest Hospital. Dr. Dola testified that she learned N.N. was treated for injuries and had been medically stabilized before she was transported to the Tulane Lakeside facility. She noted the extent of the injuries to N.N.’s face and her outward extremities. Dr. Dola testified that she spoke Vietnamese and that it was her native tongue. Therefore, she was able to obtain a “history” from N.N., who she learned was 87 years old and had been pregnant four times and delivered four times. She also learned N.N. was assaulted sexually by someone she knew as an acquaintance. According to Dr. Dola, N.N. reported that she was penetrated vaginally, but not orally or anally. N.N. *516 resisted, which resulted in facial fracture, ecchymosis (skin discolorations from blood escaping into tissues from ruptured blood vessels), bruises on her thighs, and scratches on her hands. Ecchymosis most likely occurs from a forceful trauma that did not penetrate the skin. She testified that N.N.’s “history” was consistent with her claim of sexual assault.
Dr. Dola observed scratches on N.N.’s hands and wrist. She also had facial scratches, facial ecchymosis, and bruises on her thigh. She testified that the victim appeared “badly beaten up” and her eyes were practically swollen shut. She testified that N.N.’s injuries were consistent with the use of force. N.N. cried out in pain with the insertion of the speculum, a device used in routine gynecological examinations. Dr. Dola determined that N.N. had normal female genitalia and the examination revealed no lesions or trauma. Further, no trauma to N.N.’s rectum was discovered. Although Dr. Dola was not able to observe any evidence of trauma in N.N.’s vaginal area, she noted that this was not inconsistent with N.N.’s claim of vaginal penetration. She explained that data showed that 12 to 40 percent of women who had been sexually assaulted did not have evidence of injuries. Dr. |sDola explained that the vagina can expand to accommodate insertions, regardless if the insertion is consensual. She also testified that she would not expect damage to the anal area if there was anal penetration because the anus can stretch and then regain its shape. She found no secretion to collect when examining N.N.’s anus.
Tracy Wine, a Jefferson Parish police officer, testified that she responded to a call at almost 9:00,[1] regarding a female who said she had been beaten up. Officer Wine testified that a neighbor was at N.N.’s apartment and was able to translate in Vietnamese. In the initial statement, the victim said through her translator that she was knocked unconscious and, when she woke up, Nguyen was gone. Officer Wine noticed the victim had a swollen cheek and her eye was starting to shut. She had bruises on her face and blood by her mouth, as well as bruises on her wrist and around her chest area. The injuries looked “fresh,” with the officer testifying that it appeared the beating had occurred within a half hour. Officer Wine believed that the extent of N.N.’s injuries required medical treatment, so EMS transported N.N. to Meadowcrest. She testified that N.N. was scared and very timid and that not much detail was given at the residence. Officer Wine did not ask N.N. if she was sexually assaulted when at the residence, but she followed N.N. to the hospital and continued with the investigation, not knowing that N.N. had been sexually assaulted.
A nurse at the hospital helped with the translation to Officer Wine. Officer Wine testified that, when she communicated with the nurse, she discovered that N.N. said she was sexually assaulted. When the officer asked why N.N. had not disclosed this before, N.N. said she was embarrassed and did not want her neighbor to know she had been sexually assaulted. Officer Wine testified that the victim appeared embarrassed, was crying, was upset, but had calmed down at the 19hospital. According to Officer Wine, the neighbor did not say N.N. was sexually assaulted, and it would be a surprise to learn the neighbor had known this before the officer arrived.
Detective Mike Houlihan of the Jefferson Parish Sheriffs Office investigated the rape. When Detective Houlihan went to Meadowcrest Hospital to see the victim, he observed that N.N. was “beat up pretty *517 bad,” was crying, was sluggish, and seemed kind of “out of it.” Detective Houlihan testified that a nurse was able to translate. Through the investigation, Nguyen was developed as a suspect. Detective Houlihan prepared an arrest warrant for him and was notified a couple of weeks later that Nguyen had been arrested. However, Detective Houlihan testified that a deputy told him that the person who had been arrested said they had the wrong guy, and he thought the police were looking for his brother who had the same name. They also lived at the same address. The victim was shown a photographic lineup with this person’s photograph, and she said that he was not the perpetrator. On the following date, Nguyen was presented in another photo lineup, and the victim made an identification. An arrest warrant for Nguyen was obtained, and Detective Houlihan was later notified that Nguyen had been arrested.
Detective Mike Tucker with the Sheriffs Office testified that he arrested Nguyen on February 19, 2009, after receiving a tip that he would be at a particular residence. Detective Tucker arrived and told Nguyen he had a warrant for his arrest for rape and advised him of his rights. During transportation, Nguyen initiated a statement by asking questions about the case. The detective informed Nguyen that he knew nothing about the case and had simply been there to bring him into custody. At that time, Nguyen advised that he did not rape the victim, but they had made love. Nguyen was again advised of his rights, but he went on to say |inhe met the victim, took her home in her vehicle, and they made love. Nguyen said that, the next morning, the two had an argument, he pushed her down, and left. He said nothing about hitting the victim. Detective Tucker was confused by Nguyen’s choice of words that they had “made love,” as Nguyen said he had just met the victim.
Detective Houlihan obtained a recorded statement from Nguyen, which was played for the jury at trial.
In the statement, Nguyen said that he could read and write English and acknowledged that he was advised of his rights, which he understood. He was willing to waive his rights and give a statement to Detective Houlihan. Nguyen was not related to N.N., but had met her at “Eva,” a lounge where she worked. He said he knew N.N. “for a long time but never got really acquainted.” He believed he arrived at the lounge at about 11:00 or 11:30 p.m. and stayed there until 3:30 or 4:00 a.m. Nguyen said that they sat and talked, and he offered her a couple of drinks. N.N. drank six or more beers. According to Nguyen, N.N. indicated that she did not know if she wanted a relationship. Nguyen later saw her when he walked out. N.N. was in her car and had a stomach ache or a chest ache. She did not appear to be drunk. Nguyen asked her if she wanted him to drive her home and eventually she said yes. He had to stop and pull over because of her pain, but the pain stopped. After they arrived at N.N.’s home, they sat, talked, and opened a bottle of red wine. They drank, hugged, kissed, and then made love. While they were making love, he became tired and told her he wanted to go to sleep. They lay on the couch until morning, when he woke up and said he needed to go home so he could take his nephew shopping. Nguyen asked N.N. to drive him home, but she said no because she did not want him to go. Nguyen was going to walk home, but, as he was leaving, N.N. pulled him back and would not let him go. He became Ininad when she was grabbing and scratching him. Nguyen pushed N.N., but when she came back at him again, he closed his fist and punched her in her face. He punched her once, hard, and believed *518 she fell and hit her face on the corner or arm rest of the couch. Nguyen then took her keys and her van and drove to “Eva” to get his car. He agreed he did not have her permission to take her vehicle. He left the van there and went home.
In the statement, Nguyen said that N.N. did not say “no” when they were making love. He believed the sexual intercourse was consensual. He believed N.N. was saying that it was non-consensual because she was “pissed off’ at him because he hit her. He said that N.N. took off her own clothes, and he helped. Nguyen admitted that his penis went into N.N.’s vagina and that he did not wear a condom. He believed the sexual intercourse lasted maybe five minutes, and he did not believe that he ejaculated.
Detective Houlihan acknowledged that disclosures of rape were not immediate in every case. He testified that it was not unusual for a victim to fail to report a rape immediately, and he explained that some wait hours, days, weeks, months or years. He believed this was understandable. He did not go back and talk to the neighbor because to his knowledge, the neighbor did not know of the rape. Detective Houlihan further testified that he did not believe that Nguyen hit the victim once like Nguyen said in the statement because one punch could not have caused all that injury.
On appeal, Nguyen argues that, viewing the evidence in the light most favorable to the State, supports only a verdict of forcible rape. He avers that, although the victim suffered bruising and a bone fracture from a punch to the face and was steadfast in her claim that the sexual activity was without her consent, the victim failed to articulate a single threat of harm voiced by him. Nguyen further 112argues that the victim did not claim he was armed or say that he would arm himself during the course of the incident. He contends that the' evidence only supports forcible rape, concluding that this Court should set aside the verdict of aggravated rape and, instead, enter a verdict for the lesser included offense of forcible rape.
The constitutional standard for testing the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2] Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.[3] A reviewing court is required to consider the whole record and determine whether a rational trier of fact could have found defendant guilty beyond a reasonable doubt.[4]
“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.”[5] “The rule as to circumstantial evidence is; assuming every fact to be proved that the evidence tends to prove, in order to con *519 vict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.[6]
| iSRape is defined by La. R.S. 14:41(A) as “the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.” Any sexual penetration, however slight, is sufficient to complete the crime and emission is not necessary. La. R.S. 14:41(B).
Nguyen was convicted of aggravated rape in violation of La. R.S. 14:42, which provided, in pertinent part, the following:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
Nguyen argues that, at most, the State presented evidence of forcible rape. He points to the events immediately preceding the rape, during which time the two drank together and went to N.N.’s home, continuing to drink. Nguyen also contends he was unarmed and that at no time did he threaten N.N..
La. R.S. 14:42.1 provides, in pertinent part, the following:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(l)When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
The difference between aggravated rape and forcible rape is the “degree of force employed and the extent to which the victim resists.”[7] A greater degree of force is necessary to justify the more serious punishment imposed for aggravated | urape.[8] The degree of force employed and the determination of the grade of rape is for the jury to decide.[9] However, “there is no magic formula to determine which acts of coerced sexual intercourse warrant the greater punishment of aggravated rape rather than forcible rape. Each case must be examined on its own facts.”[10]
In the present case, the jury charges included a responsive verdict of forcible rape, but determined the amount of force employed and the resistance exerted *520 amounted to aggravated rape. It appears that the trier of fact believed the victim was credible. She clearly testified that she was raped and that there was vaginal penetration without her consent. Under the circumstances of this case, vaginal penetration was sufficient to constitute rape. Nguyen does not challenge that there was penetration, but provided in his statement that the sexual intercourse was consensual.
The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness.[11] It is not the function of the appellate court to assess the credibility determinations of the trier of fact or to reweigh the evidence. The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact.[12]
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. In the case of sexual offenses, the victim’s testimony alone can be sufficient to establish the elements of a sexual |1fioffense, even if the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense.[13]
The evidence presented by the State supported the verdict of aggravated rape. According to her testimony, N.N.’s resistance was overcome by the physical force used to accomplish the rape. That testimony and the physical evidence reflect the extent of the victim’s resistance. N.N. described how Nguyen pushed her down on the sofa and testified that she pushed him “out,” telling him he could not do that to her. She described her multiple attempts to block Nguyen when he was hitting her. She explained trying to hold his arm when he was pulling her pants down and that she tried to hold onto her pants. She screamed and told Nguyen not to hit her or do this to her. She said she did not stop screaming and did not stop struggling. However, it is apparent that the relentless and brutal force used by Nguyen to accomplish the rape overcame any resistance by N.N. The evidence supports a conclusion that a specific verbal threat of great bodily harm would have, in this case, been superfluous. The mere fact that Nguyen was unarmed does not negate the possibility that an aggravated rape occurred.[14]
Further, N.N. testified about the extent of her injuries and that she was still in pain at the time of the trial. At one point, N.N. testified that she became unconscious after Nguyen put his forearm to her neck. She suffered multiple injuries to her body, including an orbital fracture, and the photographs taken of her demonstrate the extent of her injuries and the degree of force that would have been required to cause those injuries. The testimony of the doctors supported a finding of the great physical force exerted on N.N. Taken in its entirety, N.N.’s testimony, combined with the physical evidence of her injuries and the testimony of the other 11fiwitnesses, supports the jury’s decision that this was an aggravated, not a forcible, rape. Based upon the facts herein taken in their entire *521 ty, we are convinced that N.N. resisted the rape to the utmost. The facts substantiate that Nguyen was able to physically overpower the victim even though he did not threaten her with a weapon. Viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could have found beyond a reasonable doubt that the Nguyen raped the victim under circumstances where she resisted the act to the utmost, but her resistance was overcome by force. This assignment of error is without merit.
In his second assignment of error, Nguyen urges that the trial court erred in permitting his case to be tried by a jury without the services of a qualified courtroom interpreter, resulting in a denial of his right to confront his accuser.
Nguyen notes that the interpreter had only provided translation services in traffic court and had only been serving as an interpreter for about two months. He suggests that the interpreter’s broken English during “voir dire” should have sent a red flag to the court that he was unqualified for the task. He contends that the interpreter’s struggles were apparent as he attempted to translate for the victim. Nguyen also noted that defense counsel said “this isn’t working” when the interpreter was writing things down for the witness while he attempted to communicate with her. Nguyen argues that the interpreter demonstrated poor skills and that, during cross-examination, he struggled to keep up. Nguyen urges that the error in this case was so egregious as to require reversal and remand for a new trial.
At trial, the interpreter was questioned by the court. Sang Phuong testified that he spoke Vietnamese and English and understood both languages, having lived in this country since 1975. He testified that he had acted as an interpreter for about |17two months, explaining that he works for a firm that had trained and tested him, and had also evaluated his interpretation skills. Mr. Phuong said he interprets in the first person and says exactly whatever the victim says. The judge asked if there were questions for the interpreter. Neither the State nor the defense had questions. Thereafter, the court recognized Mr. Phuong as an interpreter for the court, and he was sworn in.
Defense counsel did not challenge the interpreter’s qualifications at this time. However, later, during the victim’s testimony, there was a bench conference in which defense counsel objected because the interpreter was writing things down. Defense counsel said he did not know if the interpreter had enough experience “to do this.” Thereafter, the interpreter was instructed by the court, the State, and defense counsel as to how to handle the interpretation. It was explained that the victim had to slow down so he could interpret and tell them exactly what she was saying, without writing things down.
On appeal, Nguyen argues that he suffered prejudice because he was not able to confront the victim in this case because of the non-qualified interpreter. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.[15] Further, the confrontation clause of the Louisiana Constitution specifically guarantees each accused the right *522 to confront and cross-examine witnesses against him.[16]
La. Const, art. I, § 16 grants the defendant a right to a fair trial. This constitutional article is the source of specific rights due a defendant in a criminal trial, such as the right to confront and cross-examine witnesses against him. “Utilizing this constitutional source provision, it is evident that the defendant’s | ^constitutional right to confront and cross-examine witnesses would be significantly impaired if he is unable to understand what these accusers say.”[17] Confrontation errors are subject to a harmless error analysis.[18]
Nguyen did not raise the issue of confrontation violation in the trial court. Further, defense counsel did not question the interpreter about his qualifications and mentioned a perceived lack of experience only once during the testimony of the victim. Therefore, Nguyen has, thus, not properly preserved this issue for review.[19]
Nevertheless, we note the following: La. C.Cr.P. art. 25.1 requires the court to appoint an interpreter for a non-English-speaking person who is a principal party in interest or a witness in a proceeding before the court after consultation with the non-English-speaking person or his attorney. This article states the interpreter must be “competent” to interpret or to translate the proceedings to him and to interpret or translate his testimony. However, there is no law in Louisiana that requires interpreters, other than interpreters who translate for the hearing impaired, to be certified.[20]
An interpreter should be a neutral and detached individual whose abilities are screened by the court.[21] As described above, the court did examine Mr. Phuong’s credentials. With regard to the qualifications of a translator, a trial court has great discretion in determining whether to qualify a witness as an expert, and such discretion will not be disturbed on appeal in the absence of manifest error.[22] ImOur review of the record discloses no manifest error in the determination to qualify Mr. Phuong.
In the present case, Nguyen has not claimed any specific prejudice arising out of the interpreter’s translations. There is also nothing in the record to suggest that any of the testimony at trial was improperly translated. Nguyen has failed to show that any substantial rights were violated. Further, we note that the record indicates that Nguyen spoke both Vietnamese and English. It is difficult to suggest that Nguyen was at a disadvantage to confront his accuser at trial because of some language barrier, when there is no indication in the record that he had difficulty communicating with the accuser/victim at the time of and just prior to the incident.
*523 Finally, we find that the jury was presented with sufficient evidence other than that of N.N.’s testimony to support a guilty verdict. This assignment of error is without merit.
Our error patent review reveals the following:
Although the commitment reflects a proper advisal of the prescriptive period pursuant to La.C.Cr.P. art. 930.8, the transcript reflects that the judge advised Nguyen that he had “two years after judgment of ‘conviction for sentence’ to become final within which to file post-conviction relief.” Because we must remand for other reasons, below, we remand and order the district court to clearly inform Nguyen of the appropriate prescriptive period for filing for post-conviction relief.
Further, it appears that there is a discrepancy in the commitment, which reflects that the present case involved a judge trial, when the record clearly shows this was a jury trial. Therefore, we remand the matter for correction of the commitment for purposes of accuracy, and we order the district court to make the entries in the commitment reflecting this change. The court is further ordered to |2ndirect the clerk of court to transmit the original of the minute entry to the officer in charge of the institution to which the defendant has been sentenced.[23]
Finally, the record does not reflect that Nguyen was notified of the sex offender registration requirements for his conviction of aggravated rape. La. R.S. 15:540, et seq. requires registration of sex offenders, and La. R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirement of La. R.S. 15:542 to Nguyen. The trial court’s failure to provide this notification constitutes an error patent.[24] Therefore, on remand, the court is instructed to notify Nguyen of the sex offender registration requirements (and the child predator registration provisions) and to furnish the record with proof of such notice to Nguyen.
For the foregoing reasons, the conviction and sentence are affirmed. The matter is remanded with instructions to correct the noted errors patent.

AFFIRMED; REMANDED WITH INSTRUCTIONS

. The transcript does not reflect whether this was a.m. or p.m.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See, State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La. 11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005) (quotation omitted).

. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.

. State v. Price, 00-1883 (La.App. 5 Cir. 7/30/01), 792 So.2d 180, 184.

. State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722.

. State v. Mitchell, 99-3342, p. 7 (La. 10/17/00), 772 So.2d 78, 83.

. State v. Dixon, 04-1019 (La.App. 5 Cir. 3/15/05), 900 So.2d 929 (citing State v. Parish, 405 So.2d 1080, 1087 (La. 1981) (on reh'g)).

. State v. Dixon, supra (citing State v. Jackson, 437 So.2d 855, 858 (La.1983)).

. State v. Dixon, supra (citing State v. Cepriano, 00-213 (La.App. 5 Cir. 8/29/00), 767 So.2d 893).

. State v. McGinnis, 04-1286 (La.App. 5 Cir. 10/6/05), 917 So.2d 471, 480, writ denied, 05-2469 (La.4/28/06), 927 So.2d 283.

. State v. Singleton, 05-622, p. 7 (La.App. 5 Cir. 1/31/06), 922 So.2d 647, 651.

. State v. Jones, 08-20, p. 7 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240.

. State v. Gaddis, 07-395, pp. 7-8 (La.App. 5 Cir. 11/13/07), 973 So.2d 21, 25, writ denied, 08-0156 (La. 10/10/08), 993 So.2d 1277.

. State v. Davis, 09-1061, p. 6 (La.App. 3 Cir. 4/7/10), 36 So.3d 351, 356.

. State v. Collins, 10-0757, p. 11 (La.App. 4 Cir. 5/11/11), 65 So.3d 271, 280 (quotation omitted).

. State v. Taylor, 04-346, p. 7 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 594 (quotation omitted).

. State v. Lopes, 01-1383, p. 3 (La.12/7/01), 805 So.2d 124, 126.

. See, State v. Haynes, 09-109, p. 8 (La.App. 5 Cir. 2/9/10), 34 So.3d 325, 331, writ denied, 10-0493 (La.9/24/10), 45 So.3d 1073.

. See, State v. Santos, 09-789, p. 8 (La.App. 5 Cir. 4/13/10), 40 So.3d 167, 172, writ denied, 10-1080 (La. 11/24/10), 50 So.3d 828.

. State v. Santos, 09-789 (La.App. 5 Cir. 4/13/10), 40 So.3d 167, 172-73, writ denied, 10-1080 (La. 11/24/10), 50 So.3d 828.

. State v. Davis, 07-544 (La.App. 5 Cir. 12/27/07), 975 So.2d 60, 68, writ denied, 08-0380 (La.9/19/08), 992 So.2d 952.

. See, Thongsavanh v. Schexnayder, 09-1462 (La.App. 1 Cir. 5/7/10), 40 So.3d 989, 997, writ denied, 10-1295 (La.9/24/10), 45 So.3d 1074.

. See, La.C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).

. See, State v. Morgan, 06-529, p. 23 (La.App. 5 Cir. 12/12/06), 948 So.2d 199, 213.